# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

PAUL BROWN, WILLIAM FANALY,
CHARLES THOMAS, GARY RIGGS,
ROBERT ORLIKOWSKI, and SCOTT WAY,          Case Number:  04-CV-72316

                  Plaintiffs,          JUDGE PAUL D. BORMAN
                                         UNITED STATES DISTRICT COURT

v.

CASSENS TRANSPORT COMPANY,
CRAWFORD & COMPANY, foreign
corporations, and DR. SAUL MARGULES,

                  Defendants.
_____  /

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' COMPLAINT UNDER RULE 12(b)(6)

Now before the Court are Defendants' motions to dismiss Plaintiffs' complaint under

Federal Rule of Civil Procedure 12(b)(6).  The Court heard oral argument on March 10, 2005.

Having considered the entire record, and for the reasons that follow, the Court:

    1)      DISMISSES Plaintiffs' claims under the Racketeer Influenced and Corrupt
           Organizations Act, 18 U.S.C. § 1961, *et seq.*, because they fail to state claims for
           which relief may be granted, and because Michigan's Workers' Disability
           Compensation Act, M.C.L. 418.1101, *et seq.*, reverse-preempts those claims
           under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b); and

    2)      DISMISSES Plaintiffs' state-law claims of intentional infliction of emotional
           distress against Defendants for failure to state claims for which relief may be
           granted.

## I.  PROCEDURAL BACKGROUND

At all times relevant to the instant action, Paul Brown ("Brown"), William Fanaly

("Fanaly"), Charles Thomas ("Thomas"), Gary Riggs ("Riggs"), Robert Orlikowski

("Orlikowski"), and Scott Way ("Way") (collectively "Plaintiffs") were employees of Cassens Transport Company ("Cassens"). (Compl. at ¶ 4.) Crawford & Company ("Crawford") adjusted workers-compensation claims of Cassens' employees on Cassens' behalf. (*Id.*) Dr. Saul Margules ("Margules") examined certain Plaintiffs concerning their entitlements to workers' compensation benefits. (*Id.* at ¶ 6B.)

On June 22, 2004, Plaintiffs filed suit against Cassens, Crawford, and Margules (collectively "Defendants"), alleging that each Defendant engaged in a fraudulent enterprise to deny each Plaintiff of his workers' compensation benefits in violation of the Racketeer Influenced and Corrupt Organizations Act ("the RICO Act"), 18 U.S.C. § 1961, *et seq.*, and alleging that Defendants subjected each Plaintiff to the intentional infliction of emotional distress in violation of Michigan law. (*Id.* at ¶¶ 1-77.) Plaintiffs' complaint, in essence, alleges that Defendants conspired to deny each Plaintiff's workers' compensation claim even though they were aware of facts that would support the validity of each of those claims.

On August 23, 2004, Crawford filed the instant motion to dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6). In that motion, Crawford argues that: 1) the McCarran-Ferguson Act, 15 U.S.C. § 1012, *et seq.*, preempts Plaintiffs' RICO claims; and 2) Plaintiffs' intentional-infliction-of-emotional-distress ("IIED") claims fail as a mater of law because Michigan does not recognize causes of action for the mere tortious refusal to pay workers' compensation benefits. (Crawford Mot. at 2.) Cassens and Margules concur in this motion to the extent that its arguments would equally apply to Plaintiffs' claims against them.

On September 7, 2004, Cassens filed the instant motion to dismiss Plaintiffs' complaint under Rule 12(b)(6). Along with raising the same two claims that Crawford raises in its motion

to dismiss, Cassens' motion contends that: 1) the primary-jurisdiction doctrine bars Plaintiffs' complaint; 2) the Labor Management Relations Act of 1947 ("LMRA") or § 301(a), 29 U.S.C. § 141 *et seq*., preempts Plaintiffs' RICO claims; and 3) Plaintiffs' RICO claims fail to state claims for which relief may be granted.  (Cassens Mot. at 2-3.)  Crawford and Margules concur in this motion to the extent that its arguments would equally apply to Plaintiffs' claims against them.

## II. ANALYSIS

Federal Rule of Civil Procedure 12(b)(6)  permits a party to raise as a defense to a claim for relief in a pleading the opposing party's failure to state a claim upon which relief can be granted.  Rule 12(b)(6) is designed to test whether, as a matter of law, a plaintiff is entitled to legal relief. *Nishiyama v. Dickson County*, 814 F.2d 277, 279 (6th Cir. 1987).  Before dismissing a complaint for failure to state a claim upon which relief can be granted, a court must conclude "beyond [a] doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Carver v. Bunch*, 946 F.2d 451, 452 (6th Cir. 1991).

To survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).  When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and accept well-pleaded facts as true. *Columbia Natural Resources Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).   Thus, a court may not grant a Rule 12(b)(6) motion based upon its disbelief of a complaint's factual allegations. *Id.*  A court, however, need not accept as true conclusions of law or unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity." *See generally Begala v. PNC Bank, Ohio, Nat. Ass'n,* 214 F.3d 776 (6th Cir. 2000) (holding that pleadings under the RICO Act are to be liberally construed).

Federal Rule of Civil Procedure 12(b) provides:

> If, on a motion asserting the defense . . . [of] failure to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

## A. RICO CLAIMS

The Court will proceed to discuss the following issues related to Plaintiffs' RICO claims:

1) whether the primary-jurisdiction doctrine mandates a stay of Plaintiffs' RICO claims;

2) whether the *Burford* doctrine mandates a stay of Plaintiffs' RICO claims;

3) whether the complaint pleads predicate acts of witness tampering;

4) whether the complaint pleads predicate acts of mail or wire fraud with the necessary particularity;

5) whether the complaint pleads the requisite detrimental reliance;

6) whether the McCarran-Ferguson Act reverse-preempts Plaintiffs' RICO claims; and

7) whether the Labor Management Relations Act preempts Plaintiffs' RICO claims.

### 1. Primary-Jurisdiction Doctrine

In its motion to dismiss, Cassens contends that the doctrine of primary jurisdiction applies to Plaintiffs' RICO claims. (Cassens Br. at 20.) According to Cassens, all of the Plaintiffs except Fanaly have claims for workers' compensation benefits that are pending before

4

the Workers Disability Compensation Bureau ("the WDCB").  (Reply at 5.)

The primary-jurisdiction doctrine's aim is to "promot[e] proper relationships between the courts and administrative agencies charged with particular regulatory duties."  *United States v. Western Pac. R. R. Co.,* 352 U.S. 59, 63 (1956).  Specifying when the doctrine of primary jurisdiction is applicable, the Supreme Court has held:

> . . . . 'Primary jurisdiction' applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of a claim requires a resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case[,] a judicial process is suspended pending referral of such issues to the administrative body for its views.

*Id.* at 63-64.  Thus, the primary-jurisdiction doctrine applies where: 1) the Court has original jurisdiction over the claim before it; 2) the adjudication of that claim requires the resolution of certain underlying issues; and 3) a regulatory scheme commits the resolution of those issues to an administrative agency's special competence.  In deciding whether the primary-jurisdiction doctrine applies in any given case, the court must determine whether the application of that doctrine in the particular case would serve the following twin rationales underlying that doctrine: 1) uniformity in questions of an administrative nature; and 2) the expert and specialized knowledge of the relevant agency to the issue in question.  *Id.* at 64.

The threshold requirements for the applicability of the primary-jurisdiction doctrine are met here.  First, the Court clearly has jurisdiction over Plaintiffs' RICO claims as they arise under federal law.  Second, the adjudication of Plaintiffs' RICO claims–i.e. that Defendants engaged in a RICO enterprise fraudulently to deny Plaintiffs' workers' compensation benefits–hinges, in part, upon whether Plaintiffs are entitled to those benefits in the first instance. (Cassens Br. at 20; Resp. Cassens at 17.)  Lastly, a regulatory scheme of the Michigan

legislature, the Workers' Disability Compensation Act ("the WDCA"), commits the resolution of an employee's entitlement to workers' compensation benefits to the special competence of the WDCB. (Cassens Br. at 20.) Specifically, the WDCA, M.C.L. 418.841(1), provides:

> Any dispute or controversy concerning compensation or other benefits shall be submitted to the bureau and all questions arising under this act shall be determined by the bureau or a workers' compensation magistrate, as applicable.

The primary-jurisdiction doctrine's twin rationales are also met here. Given the complicated medical issues underlying Plaintiffs' entitlement to workers' compensation benefits, the WDCB, rather than the Court, possesses the necessary expertise and the specialized knowledge properly to resolve those underlying issues and, thus, the ultimate issues of Plaintiffs' entitlement to benefits. Deferring to the WDCB's determination of a plaintiff's entitlement to workers' compensation benefits in cases such as this would promote uniformity in such determinations. Thus, a consideration of the relevant factors counsels in favor of applying the primary-jurisdiction doctrine to stay the adjudication of Plaintiffs' RICO claims, if they survive the instant motion.[1]

On the other hand, it is unclear whether the primary-jurisdiction doctrine may apply in favor of a state administrative agency where the claim at issue arises under federal law and there are no competing federal forums. 73 C.J.S. Public Administrative Law and Procedure § 72. The majority of courts that have applied the primary-jurisdiction doctrine have done so in favor of a

---

[1]While Cassens contends that the application of the primary-jurisdiction doctrine to Plaintiffs' RICO claims would require the dismissal of those claims, such a contention is incorrect. (Cassens Br. at 20-21.) The principal issue underlying the application of that doctrine is simply whether a federal court should postpone the exercise of its jurisdiction in deference to an administrative agency; it does not divest the Court of its subject-matter jurisdiction. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 353(1963).

federal administrative agency.[2]  *See Far East Conference v. United States*, 342 U.S. 570, 574-75

(1952) (applying the doctrine in favor of the Federal Maritime Board in the context of federal

claims); *Western Pac. R. R. Co.,* 352 U.S. at 63-64 (applying the doctrine in favor of the

Interstate Commerce Commission in the context of federal claims); *In re Long Distance*

*Telecommunications Litigation*, 831 F.2d 627, 631-32, 634 (6th Cir. 1987) (applying the doctrine

in favor of the Federal Communications Commission in the context of federal claims).

In *County of Suffolk v. Long Island Lighting Co.,* the United States Second Circuit Court

of Appeals held that, subject to a narrow exception, the primary-jurisdiction doctrine does not

apply in favor of a state administrative agency where there is a federal claim at issue and where

there are no competing federal forums.  907 F.2d 1295, 1310 (2d Cir. 1990) (holding that the

exception applies where a state administrative agency operates pursuant to a federal legislative

scheme).  The Second Circuit chiefly reasoned that the "theoretical underpinning of the primary-

jurisdiction doctrine . . . is the authority [that] *Congress* intended th[e] [administrative] agency to

exercise within a particular statutory scheme."  *Id.* (emphasis in original)*; see Far East*

*Conference,* 342 U.S. at 574-75 (addressing the doctrine in terms of a regulatory scheme that

---

[2]At least one federal court sitting in diversity jurisdiction has applied the primary-jurisdiction doctrine in favor of a state administrative agency.  *See Northwinds Abatement, Inc. v. Employers Ins. of Wausau,* 69 F.3d 1304, 1311 (5th Cir. 1995) (holding that, under the doctrine, the district court should have stayed the diversity-jurisdiction case pending the state workers' compensation commission's final decision on whether the defendant properly paid certain workers' compensation claims).  It is unclear, however, whether that federal court deferred to the state administrative agency's primary jurisdiction only on the ground that the *Erie* doctrine would compel such deferral.  *See* 73 C.J.S. Public Administrative Law and Procedure § 72; *Virginia Imports, Inc. v. Kirin Brewery of Am., LLC*, 296 F. Supp. 2d 691, 698, 698 n.1 (E.D. Va. 2003) (holding that, in a diversity-jurisdiction case involving only state claims, the primary-jurisdiction doctrine does not apply in favor of a state agency, as compared to a federal agency, and holding that, even if the doctrine were to apply, a federal district court sitting in diversity would defer to a state agency's primary jurisdiction only if state courts would so defer).

Congress created, and noting that courts and administrative agencies are "means adopted to attain the prescribed end . . . through co-ordinated action"). The Second Circuit elaborated that, "[i]n the federal question/federal agency context, the creation of an agency and the grant to it of certain adjudicative authority may evince a congressional intent to limit the judiciary's jurisdiction." *County of Suffolk,* 907 F.2d at 1310. As the Court pointed out, "the independent act of a state legislature in creating a particular administrative body . . . can shed no light on *Congress'* intent to limit the jurisdiction of the federal courts[.]" *Id.* at 1311. While finding that the agency-expertise rationale underlying the primary-jurisdiction doctrine was implicated in the case, the Court underscored that it is that doctrine's theoretical underpinnings that controls its applicability, "not the functional competence of an agency[.]" *Id.* at 1310.

However, in the subsequent case of *Johnson v. Nyack Hospital,* the Second Circuit held that, under the primary-jurisdiction doctrine, the district court should have stayed the plaintiff's federal antitrust claim pending a state administrative agency's determination of the complicated factual issues underlying that claim. 964 F.2d 116, 122-23 (2d Cir. 1992) (noting that, under the distinct doctrine of exhaustion, the issue is whether Congress' statutory intent was to render a federal claim cognizable only in the first instance by an administrative agency, whether state or federal). While recognizing that most cases applying the primary-jurisdiction doctrine did so in favor of a federal administrative agency, the Court reasoned that the application of that doctrine there served the underlying agency-expertise rationale as well as judicial economy. *Id.* The Court neither mentioned nor distinguished *County of Suffolk.* Thus, it is unclear what remains, if anything, of the precedential value of *County of Suffolk.*

As discussed below, the *Burford* doctrine would compel the stay of Plaintiffs' RICO

claims pending the WDCB's determination of Plaintiffs' entitlements to workers' compensation benefits.

## 2. *Burford* Abstention Doctrine

The *Burford* abstention doctrine takes its name from the Supreme Court's decision in *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943). In *Rouse v. DaimlerChrysler Corporation,* the United States Court of Appeals for the Sixth Circuit underscored that the aim of the *Burford* doctrine is to "avoid conflict with a state's administration of its own affairs." 300 F.3d 711, 716 (6th Cir. 2002). The Sixth Circuit held that, therefore, the *Burford* doctrine "applies only if a federal court's decision on a state law issue is likely to 'interfere with the proceedings or orders of state administrative agencies.'" *Id.* The Sixth Circuit further held:

> The *Burford* abstention [doctrine] should not be applied unless: (1) a case presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or (2) the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Id.*(internal quotation marks omitted); *see Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727 (1996) (implicitly recognizing that the *Burford* doctrine may apply where the case involves either a "state-law claim" or "an assertion that the federal claims [were] . . . entangled in a skein of state law that must be entangled before the federal case can proceed") (internal quotation marks omitted). Since *Burford*, the Supreme Court has held that a federal court may dismiss or remand a complaint "based on abstention principles only where the relief being sought is equitable or otherwise discretionary." *Quackenbush,* 517 U.S. at 731 (illustrating such equitable or discretionary relief with suits for injunctive relief or certain classes of declaratory judgments). However, the Court noted that, in actions "at law" or for damages, it has only permitted federal

9

courts, based on abstention principles, to "enter a stay order that *postpones* adjudication of the dispute, not to dismiss the federal suit altogether." *Id.* at 719.

Cassens contends that the Court should apply the *Burford* doctrine to Plaintiffs' RICO claims so that the WDCB may determine Plaintiffs' entitlement to workers' compensation benefits in the first instance.[3] (Cassens Reply at 5.) Plaintiffs, in response, maintain that Cassens has failed to present any meaningful argumentation on the applicability of the *Burford* doctrine to Plaintiffs' RICO claim. (Resp. at 19.) Yet, since the *Burford* doctrine implicates important issues of comity.

Contrary to Plaintiffs' contention, the determination of their entitlement to workers' compensation benefits in this federal forum would likely frustrate or undermine Michigan's workers' compensation scheme, as set forth in the WDCA. (*See* Resp. Cassens at 19.) That administrative scheme is comprehensive, setting forth the nature and amount of the particular benefits to which it affords entitlement, the scope of any such entitlement, and the administrative and judicial processes for resolving any disputes regarding that entitlement. The determinations of Plaintiffs' entitlement to workers' compensation benefits often hinge upon complex medical issues. Given the expertise and specialized knowledge necessary to resolve such underlying issues properly, the determination of Plaintiffs' entitlement to workers' compensation benefits in this federal forum may result in adjudications that would be contrary to those of the WDCB. Indeed, the frequent resolution, in a federal forum, of a plaintiff's entitlement to workers'

---

[3]While Cassens contends that the application of the *Burford* doctrine to Plaintiffs' RICO claims requires the Court to dismiss those claims, *Quackenbush* forecloses any such contention. (Reply at 5.) Rather, at issue is whether the Court should stay Plaintiffs' RICO claims pending the WDCB's determination of Plaintiffs' entitlement to workers' compensation benefits.

10

compensation benefits in cases such as this would likely undermine the uniformity and

coherence in such determinations that Michigan seeks to achieve via its establishment of the

WDCB.

Contrary to Plaintiffs' assertion, an employee's entitlement to workers' compensation

benefits bears upon "policy problems of a substantial public import" or "matter[s] of substantial

public concern." *See Rouse,* 300 F.3d at 716.  (*See* Resp. to Cassens at 19.)  As the Michigan

Supreme Court has declared:

> The primary purpose of the . . . [WDCA] is to provide benefits to the victims of
> work-related injuries by allocating the burden [of] these payments to the employer
> and, therefore, ultimately, to consumers.  An employee who suffers an injury
> arising out of and in the course of his employment will be eligible for
> compensation regardless of whether the employer was at fault.  In return, the
> employer is immunized from tort liability because the . . . [WDCA], under M.C.L.
> § 418.131(1) . . . , provides that this compensation is the exclusive remedy for a
> personal injury, except for an injury resulting from intentional tort.  Thus, . . .[the
> WDCA's] purpose is to provide . . . not only for employees a remedy which is
> both expeditious and independent of proof of fault, but also for employers a
> liability which is limited and determinate.

*Simkins v. General Motors Corp.,* 453 Mich. 703, 710 (Mich. 1996).  Thus, an employee's

entitlement to workers' compensation benefits bears upon Michigan's significant interest in

safeguarding the policy balance that the legislature struck in the WDCA by ensuring employees'

speedy and no-fault recovery of guaranteed compensation for work-related injuries and by

shielding employers, in exchange for providing their employees with such compensation, from

liability beyond that which the WDCA permits.  Moreover, both Michigan's employers and their

employees have substantial interests in gaining their respective benefits from that regulatory

balance.  In determining an employee's entitlement to workers' compensation, a federal forum

may not be as adept at navigating that policy balance as the WDCB, to which the Michigan

11

Legislature entrusted that task in the first instance.  Furthermore, the improper denial of an employee's entitlement to workers' compensation benefits for a work-related disability would be of great public important were that employee, consequently, to become a ward of the state.

Comparatively-speaking, in contrast to its substantial interest in resolving the federal-law issues of Plaintiffs' RICO claims, this federal forum would have a minimal interest in determining Plaintiffs' entitlement to workers' compensation benefits.  The Court would, therefore, stay Plaintiffs' RICO claims based on their alleged entitlement to workers' compensation benefits, if they survived the instant motions, pending a final determination of Plaintiffs' entitlement to those benefits via Michigan's workers' compensation scheme.

### 3. RICO Claims

The RICO Act, 18 U.S.C. § 1961, *et seq.,* affords a civil remedy when an individual is "injured in his business or property" by virtue of a violation of § 1962 of the Act.  *See* 18 U.S.C. § 1964(c)(providing that the person may "recover threefold the damages [that] he sustains and the cost of the suit, including a reasonable attorney's fee").  Section 1962(c) of the RICO Act provides, in part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .

18 U.S.C. § 1962(c).

The RICO claims that Plaintiffs' complaint sets forth solely arise under § 1962(c).  In the instant motions to dismiss, Defendants contend that Plaintiffs' complaint, however, fails to plead claims under § 1962(c) for which relief may be granted.

The elements of a viable cause of action under 18 U.S.C. § 1962(c) are: 1) the conduct 2)

12

of an enterprise 3) through a pattern 4) of racketeering activity.  *Central Distributors of Beer,*

*Inc. v. Conn*, 5 F.3d 181 (6th Cir. 1993)(quoting *Sedima v. Imrex,* 473 U.S. 479, 496 (1985)).

Section 1961(1)(B) of the RICO Act defines the requisite "racketeering activity"  to include, as a

predicate act, "any act which is indictable under any of the following provisions of title 18,

United States Code . . . section 1341 (relating to mail fraud), section 1343 (relating to wire

fraud), . . . [and] section 1512 (relating to tampering with a witness, victim, or an informant)[.]"

18 U.S.C. § 1961(1)(B).  Section 1961(5) of the RICO Act mandates that the requisite "pattern

of racketeering activity" include at least two acts of such activity, which must have occurred

within a ten-year period. 18 U.S.C. § 1961(5).

### a. Witness Tampering

Cassens, for the first time in reply, asserts that Plaintiffs' complaint fails sufficiently to

plead a predicate act of witness tampering under 18 U.S.C. § 1512. (Reply at 4.)   Plaintiffs'

complaint, per paragraphs 12, 16A, 32, and 34A, alleges that each Defendant twice violated §

1512 when, on two occasions, the corporate Defendants "expressly or implied[ly] communicated

to" Margules that they wanted him to write false cut-off reports for Plaintiffs Fanaly and Brown

regardless of their actual entitlement to workers' compensation benefits and when Margules

opined to the other Defendants that Plaintiffs had no job-related disabilities.  (Compl. at ¶¶ 12,

16A, 32, 34A.)

These allegations, however, are insufficient to survive a motion to dismiss.  Plaintiffs'

complaint fails to explain how Defendants' actions violated § 1512.  Indeed, Plaintiffs

acknowledged the tenuous and specious nature of such predicate acts at oral argument.

Accordingly, the Court dismisses Plaintiffs' RICO claims to the extent that they rely upon

predicate acts under 18 U.S.C. § 1512.

### b.  Mail and/or Wire Fraud

A plaintiff must prove each element of the predicate act or "racketeering activity" for a

civil action under the RICO Act to lie.  *Central Distributors of Beer, Inc. v. Conn,* 5 F.3d 181,

183-84 (6th Cir. 1993).  "To allege a violation of the mail fraud statute, it is necessary to show

that: 1) the defendants formed a scheme or artifice to defraud; 2) the defendants used the United

States mails or caused a use of the United States mails in furtherance of the scheme; and 3) the

defendants did so with the specific intent to deceive or to defraud."  *Id.* at 184 (citing *Schreiber*

*Distributing v. Serv-well Furniture*, 806 F.2d 1393, 1399 (9th Cir. 1988)).  Similarly, to allege a

violation of the wire fraud statute, it is necessary to show: 1) "the formation of a scheme or

artifice to defraud; 2) use of the United States wires or causing a use of the United States wires

in furtherance of the scheme; and 3) [the] specific intent to deceive or to defraud."  *Id.* (citing

*Schreiber,* 806 F. 2d at 1400).

Federal Rule of Civil Procedure 9(b) states:

> In all averments of fraud or mistake, the circumstances constituting fraud or
> mistake shall be stated with particularity.  Malice, intent, knowledge, and other
> condition of mind of a person may be averred generally.

Where a plaintiff relies upon mail or wire fraud to constitute a predicate act under RICO, Rule

9(b) requires that he must allege, at a minimum, the time, place, and contents of the fraudulent

communications. *Bender v. Southland Corp.,* 749 F.2d 1205, 1216 (6th Cir. 1984).

### (1) Requisite Particularity

In its motion to dismiss, Cassens contends that Plaintiffs' complaint fails, as a matter of

law, to plead the predicate acts of wire or mail fraud underlying their RICO claims with the

14

particularity that Rule 9(b) requires.  (Cassens Br. at 16.)  In particular, Cassens asserts that Plaintiffs' complaint fails to plead with particularity the time, place, or content of the communications underlying the alleged predicate acts of mail or wire fraud.  (Cassens Br. at 17.) Plaintiffs, in response, assert that their complaint pleads the mail and wire communications with the necessary particularity.  (Resp. Cassens at 10).

As to Plaintiff Fanaly's RICO claims, the complaint pleads with the requisite particularity two predicate acts of mail fraud, per paragraphs 9 and 14, and one predicate act of wire fraud, per paragraph 8.  Paragraphs 12 and 16A plead additional claims of mail and wire fraud in that they allege, respectively, that "Defendants expressly or implied[ly] communicated to" Margules that they wanted him to write false cut-off reports regardless of the true circumstances, and that "Margules opined to the other [D]efendants that [P]laintiff had no job-related disability."  (Compl. at ¶¶ 12, 16A.)  Paragraphs 12 and 16A further plead that these communications were "by mail and wire and are not in the possession of [P]laintiff but are in the possession of [D]efendants," and that these allegations are "based in part upon information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery." (*Id.*)  Paragraphs 12 and 16A fail to plead the time and place of such communications.

Plaintiffs contend that, where, as here, their complaint expressly invokes Federal Rule of Civil Procedure 11(b)(3), which allows pleading based on "evidence reasonably anticipated after further investigation or discovery," the Court should relax the particularity-requirement of Rule 9(b).  (Resp. Cassens at 11.)  In *Rotella v. Wood,* the Supreme Court affirmed that Rule 11(b)(3) provides some "flexibility" concerning Rule 9(b)'s particularity requirement. 528 U.S. 549, 560

(2000) (citing *Corley v. Rosewood Care Center, Inc. of Peoria,* 142 F.3d 1041, 1050-51 (7th Cir.

1998), in which the court relaxed Rule 9(b)'s particularity requirements where the RICO plaintiff

lacked access to all facts necessary to detail his claim).  On the other hand, while Rule 11(b)(3)

may relax Rule 9(b)'s particularity requirement, it cannot be construed to eviscerate that

requirement in its entirety by permitting rank speculation.  The Court strikes from the complaint

the predicate acts alleged in paragraphs 12 and 16A.  However, Fanaly's RICO claims, per

paragraphs 8, 9, and 14, plead with the requisite particularity at least two predicate acts of mail

and/or wire fraud.[4]

As to Plaintiff Thomas' RICO claims, the complaint pleads with the necessary

particularity only one predicate act, mail fraud per paragraph 23.  However, paragraph 24 fails

properly to plead another predicate act.  Rather, paragraph 24 simply alleges that "Defendants

also committed mail fraud in that their pleadings in the workers' compensation case fraudulently

denied that [P]laintiff suffered a work-related injury when they had knowledge that [P]laintiff

had suffered" such an injury. (Compl. at ¶ 24.)  Paragraph 24, which neither invokes Rule

11(b)(3) nor would have any reason to do so,  fails to allege with the necessary particularity the

time or the place of that communication.  Because Thomas' RICO claims only sufficiently plead

one predicate act, they fail, as a matter of law, to allege the requisite "pattern of racketeering

activity" and, thus, to plead RICO claims for which relief can be granted.[5]  *See* 18 U.S.C. §

---

[4]Nevertheless, Fanaly's RICO claims based upon the predicate acts in paragraphs 8, 9, and 14–along with the predicate act in paragraph 12–fail to state claims for which relief may be granted, as discussed below.

[5]Moreover, even if paragraph 24 alleges a predicate act of mail fraud with the necessary particularity, Thomas' RICO claims would still fail to state claims for which relief may be granted based upon the predicate act in paragraph 23, as addressed below.

1961(5).

As to Plaintiff Brown's RICO claims, the complaint pleads with the necessary particularity three predicate acts of mail fraud, per paragraphs 35 and 41A, and three predicate acts of wire fraud, per paragraphs 41 and 41A.  Paragraphs 32 and 34 allege, respectively, that Defendants "expressly or implied[ly] communicated" to Margules via mail and wire that they wanted him to write false cut-off reports, and that Margules opined to Defendants via mail and wire that Brown had no job-related disability; both paragraphs expressly invoke Rule 11(b)(3). For the same reasons stated above, the Court finds that paragraphs 32 and 34 do not plead predicate acts of mail and wire fraud with the requisite particularity to survive the instant motions to dismiss.  However, Brown's RICO claims, per paragraphs 35, 41, and 41A, plead with the requisite particularity at least two predicate acts of mail and/or wire fraud.[6]

As to Plaintiff Riggs' RICO claims, the complaint pleads only one predicate act–mail fraud per paragraph 48–although it does so with the requisite particularity.[7]  Because Riggs' RICO claims fail to plead at least two predicate acts, they fail, as a matter of law, to allege the requisite "pattern of racketeering activity" and, thus, to plead RICO claims for which relief can be granted.[8] *See* 18 U.S.C. § 1961(5).

As to Plaintiff Orlikowski's RICO claims, the complaint pleads a predicate act of mail

---

[6]In any event, as discussed below, Brown's RICO claims based upon the predicate acts in paragraphs 35, 41, and 41A–along with those in paragraphs 32 and 34–fail to state claims for which relief may be granted.

[7]Moreover, as discussed below, Riggs' RICO claims based upon the predicate act in paragraph 48 would fail to state claims for which relief may be granted for another reason.

[8]Moreover, Riggs' RICO claims based upon the predicate act of mail fraud in paragraph 48 fail to state claims for which relief may be granted for another reason, as addressed below.

fraud, per paragraph 58, with the requisite particularity.  Paragraph 57 pleads another predicate

act of mail and/or wire fraud based upon Margules' transmission of his allegedly-fraudulent

medical report to Defendants.  While paragraph 57, which does not invoke Rule 11(b)(3), pleads

the time and content of the communication, it fails to specify the means of the communication.

Even if paragraph 57 were to plead a predicate act of mail or wire fraud with the requisite

particularity, Orlikowski's RICO claims based upon such a predicate act–along with the

predicate act in paragraph 58–would, nevertheless, fail as a matter of law, as discussed below.

Lastly, as to Plaintiff Way's RICO claims, the complaint pleads with the necessary

particularity at least two predicate acts of mail fraud, per paragraphs 68 and 69.[9]

The Court, therefore, dismisses the RICO claims of Plaintiffs Thomas and Riggs for

failure to plead the requisite "pattern of racketeering activity" and, thus, to plead RICO claims

for which relief can be granted.  *See* 18 U.S.C. § 1961(5).

### c.  Detrimental Reliance

In its motion to dismiss, Cassens contends that Plaintiffs must either plead detrimental

reliance as an element of each predicate act of mail or wire fraud underlying their RICO claims

or as part of the causation element of those claims, and that Plaintiffs' complaint has failed to do

so.  (Cassens Br. at 17, 19; Reply at 4.) Plaintiffs, in response, assert otherwise. (Resp. at 15)

In *Blount Financial Services, Inc. v. Walter E. Heller & Co.,* 819 F.2d 151, 152-53 (6th

Cir. 1987)*,* the United States Court of Appeals for the Sixth Circuit held that a civil RICO

complaint involving a predicate act of mail fraud must allege "with particularity the false

---

[9]However, Way's RICO claims based upon the predicate acts in paragraphs 68 and 69 fail to
state claims for which relief may be granted, as discussed below.

statement of fact made by the defendant which the plaintiff relied on and the facts showing the

plaintiff's reliance on defendant's false statement of fact" to establish the "scheme to defraud"

element of mail fraud. *Accord Bender,* 749 F.2d at 1216; *Central Distributors,* 5 F.3d at 184.

The Sixth Circuit continues to espouse this holding.[10]

While a plaintiff need not plead detrimental reliance as an element of each predicate act

of mail or wire fraud underlying his RICO claims, the Sixth Circuit, in *Chaz Construction,*

*L.L.C. v. Codell*, recently opined that "*Central Distributors* [*v. Conn.,* 5 F.3d 181, 184 (6th Cir.

1993),] held that a showing of reliance is required to establish standing in civil RICO cases" and

that this "holding . . . is not in conflict with the Supreme Court's decision in *Neder* [*v. United*

*States,* 527 U.S. 1 (1999),] or th[e] . . . [Sixth Circuit's] decision in [*United States* v.] *Daniel,*

[329 F.3d 480 (6th Cir. 2003)]." No. 04-5200, 2005 WL — (6th Cir. May 11, 2005) (unpublished

opinion). In *Chaz Construction,* the Sixth Circuit recognized that, per *Neder*, the common-law

requirement of justifiable reliance has no place in the federal fraud statutes–to wit, that reliance

is not an element of mail or wire fraud. *Id.* Underscoring that criminal prosecutions, unlike civil

actions, under RICO do not require standing, *Chaz Construction* reasoned that, "[t]herefore, the

---

[10]*See VanDenBroeck v. Commonpoint Mortgage Co.,* 210 F.3d 696, 701 (6th Cir. 2000)
(holding, in a civil RICO case based upon predicate acts of mail and wire fraud, that the plaintiff
must plead "a material misrepresentation of fact that was calculated or intended to deceive
persons of reasonable prudence and comprehension," and that the plaintiff "relied upon that
material misrepresentation" to establish the fraud statutes' requisite "scheme to defraud");
*Armbruster v. K-H Corporation,* 206 F. Supp. 2d 870, 898 (E.D. Mich. 2002) (relying upon
*Blount,* 819 F.2d at 152, and *Bender,* 749 F.2d at 1215, to hold that a civil RICO complaint
based upon predicate acts of mail fraud must plead the plaintiff's reliance upon the defendant's
misrepresentation); *Paycom Billing Services, Inc. v. Payment Resources Int'l,* 212 F. Supp. 2d
732, 736 (W.D. Mich. 2002) (relying upon *VandenBroeck,* 210 F.3d at 701, to hold that a civil
RICO complaint based upon predicate acts of mail fraud must plead the plaintiff's reliance upon
the defendant's material misrepresentation).

holding in *Central Distributors* that plaintiffs must plead reliance in order to establish standing

in a civil RICO case does not conflict with the holdings in *Neder* and *Daniel* . . . . " *Id.*

Plaintiffs assert that their complaint sufficiently pleads that Plaintiffs detrimentally relied

upon the allegedly fraudulent communications underlying the alleged predicate acts, if such

detrimental reliance were required.  (Resp. Cassens at 17.)  Specifically, Plaintiffs' complaint

asserts that they relied upon such communications by "suffer[ing] the financial loss of having to

pay attorney fees, medical care, and medical mileage."  (Compl. at ¶¶ 17, 25, 38, 42, 50, 61, 70.)


As Defendants aptly note, Plaintiffs argue, in essence, that they relied upon the alleged

fraudulent communications by challenging and disclaiming the truthfulness or validity of the

content of those communications, rather than by assuming the truthfulness or validity of such

content and by taking actions based upon that assumption to their detriment.  (Cassens Br. at 19.)

Yet, the plaintiff must detrimentally rely upon the alleged fraudulent communications by virtue

of being "deceived by" them.  *See Grantham and Mann, Inc. v. American Safety Products., Inc.,*

831 F.2d 596, 606 (6th Cir. 1987).  Here, most of the predicate acts of mail and/or wire fraud in

Plaintiffs' complaint surround Notices of Dispute or other communications to Plaintiffs setting

forth the reason for Defendants' denial of Plaintiffs' workers' compensation benefits, per

paragraphs 8, 9, 14, 23, 35, 48, 58, 69, or communications to a particular Plaintiff regarding

Defendants' refusal to pay Plaintiff's  medical bills pending a workers' compensation appeal or

Defendants' assertion that they mistakenly believed that they were not obligated to do so, per

paragraph 41 and 41A.  However, instead of detrimentally relying upon those communications

by virtue of being deceived by their content, Plaintiffs, as their complaint acknowledges,

20

challenged the validity of that content in the first instance.  Thus, Plaintiffs' injury arose, not from their reliance upon such fraudulent communications, but, rather, from Defendants' denial of Plaintiffs' workers' compensation benefits.  *See Grantham*, 831 F.2d at 606.  Moreover, a plaintiff cannot detrimentally rely upon any alleged fraudulent communications that were not directed to him.  *Cf. Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181 (6th Cir. 1993).  Here, paragraphs 12, 16A, 32, 34, 41, 57, and 68 allege fraudulent communications by Defendants that were not directed at any Plaintiff.

Thus, by failing to plead the key requirement of detrimental reliance, Plaintiffs' RICO claims based upon the predicate acts in paragraphs 8, 9, 12, 14, 23, 32, 34, 35, 41, 41A, 48, 57, 58, 68, and 69 fail to state claims for which relief may be granted.  Because Fanaly's RICO claims, which are based upon predicate acts in paragraphs 8, 9, 12, 14, and 16A, fail to plead at least two predicate acts upon which such claims may be granted, they necessarily fail to plead the requisite "pattern of racketeering activity."  *See* 18 U.S.C. § 1961(5).  Since Brown's RICO claims, which are based upon predicate acts in paragraphs 32, 34, 35, 41, and 41A, fail to plead at least two predicate acts upon which such claims may be granted, they fail to plead the necessary "pattern of racketeering activity" as a matter of law.  Because Orlikowski's RICO claims, which are based upon predicate acts in paragraphs 57 and 58, fail to plead at least two predicate acts upon which such claims may be granted, they necessarily fail to plead the requisite "pattern of racketeering activity."  Lastly, since Way's RICO claims, which are based upon predicate acts in paragraphs 68 and 69, fail to plead at least two predicate acts upon which such claims may be granted, they fail, as a matter of law, to plead the necessary "pattern of racketeering activity."  In sum, Plaintiffs' RICO claims fail to state claims for which relief may

be granted.  The Court, therefore, dismisses all of the Plaintiffs' RICO claims.

### 4. McCarran-Ferguson Preemption

Crawford argues that, under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b),  the

WDCA, M.C.L. 418.1101, *et seq*., reverse-preempts Plaintiffs' RICO claims, which allege that

each Defendant engaged in a fraudulent enterprise to deny each Plaintiff of his workers'

compensation benefits.  (Crawford Br. at 2.) Plaintiffs, in turn, maintain that the McCarran-

Ferguson Act does not preempt their RICO claims.

The McCarran-Ferguson Act, 15 U.S.C. § 1012(b), provides:

> No act of Congress shall be construed to invalidate, impair, or supersede any law
> enacted by any State for the purpose of regulating the business of insurance . . .
> unless such acts specifically relate to the business of insurance.

The McCarran-Ferguson Act's aim is to establish "a form of inverse preemption, letting state

law prevail over general federal rules–those that do not 'specifically relate to the business of

insurance.'"  *Nationwide Mutual Ins. Co. v. Cisneros,* 52 F.3d 1351, 1360 (6th Cir. 1995)

(internal quotation marks omitted).  However, under the Act, "when Congress enacts a law

specifically relating to the business of insurance, that law controls."  *Humana Inc. v. Forsyth*,

525 U.S. 299, 306 (1999).  To recap, the McCarran-Ferguson Act precludes the application of a

federal statute: 1) that does not "specifically relate to the business of insurance"; 2) in the face of

state law "enacted . . . for the purpose of regulating the business of insurance"; and 3) where the

federal statute would "invalidate, impair, or supersede" the state insurance law.  *Id.* at 307.

As to the first prerequisite, the RICO Act is not a federal statute that "specifically

relate[s] to the business of insurance."  *Humana*, 525 U.S. at 307.  Thus, the first prerequisite to

reverse-preemption under the Act is met here.

22

As to the second prerequisite, a state law is "enacted . . . for the purpose of regulating the business of insurance" where:  1) it has the "effect of transferring or spreading the policyholder's risk"; 2) it is an "integral part of [the] policy relationships between [the] insurer and [the] insured"; and 3) it is "limited to entities within the insurance industry."  *Medical Mut. of Ohio v. DeSoto*, 245 F.3d 561, 574 (6th Cir. 2001).  The Court recognizes that whether Michigan enacted the WDCA "for the purpose of regulating the business of insurance" is, indeed, a thorny issue.  The Court concludes, however, that the WDCA does, in fact, regulate the business of insurance.

First, the Court finds that the WDCA transfers or spreads a risk that is characteristic of insurance.  *See Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119 (1982).  As the Michigan Supreme Court has opined, "[t]he primary purpose of the . . . [WDCA] is to provide benefits to the victims of work-related injuries by allocating the burden [of] these payments to the employer and, therefore, ultimately, to consumers."  *Simkins,* 453 Mich. at 710.

Second, the Court finds that the WDCA is an "integral part of [the] policy relationships between [the] insurer and [the] insured."  *DeSoto*, 245 F.3d at 574.  The WDCA requires all Michigan employers to provide workers' compensation benefits to their employees, either by self-insuring or by purchasing insurance from a duly-authorized insurance company.  If one were to define the employee as the insured and the self-insured employer as the insurer, then the WDCA would, indeed, be an integral part of the policy relationship between the employee and employer, so defined.  If one were to define the non-self-insured employer and the employer's insurer or the employee and the employer's insurer as the insured and insurer, respectively, then the WDCA would still be an integral part of the policy relationship between those entities and individuals in that the employer and its insurer have, in essence, contractually agreed to have the

23

insurer fulfill the employer's obligations to its employees under the WDCA.

Lastly, the Court concludes that the WDCA is "limited to entities within the insurance industry." Plaintiffs, in essence, maintain that the WDCA is not limited to such entities because it reaches self-insured employers and claims' adjusters, like Cassens and Crawford, respectively, and is not limited to insurance companies. (Resp. to Crawford at 1; Resp. to Cassens at 6.) However, as Crawford points out, adjusters of insurance claims are entities within the insurance industry. *See Pireno,* 458 U.S. at 134 n.8. By electing to self-insure its obligation to provide workers' compensation benefits to its employees, pursuant to the WDCA's strict requirements, the employer, in effect, stands in the stead of an insurance company. The WDCA does not include entities outside of the insurance industry simply because it reaches employees, whom one could characterize as either the insured or the beneficiaries of the insurance. Similarly, the WDCA does not include entities outside of the insurance industry simply because it reaches employers who elect to purchase insurance from an insurance company rather than to self-insure, which employers one could, then, characterize as the insured.

The Court notes that the Michigan Legislature did not expressly associate the WDCA with the regulation of insurance. *See Biondo v. Life Ins. Co. of North Am.,* 116 F.Supp.2d 872, 883 (E.D. Mich. 2000). Rather, as Plaintiffs aptly note, Michigan Complied Laws place the WDCA in Chapter 418 dealing with labor rather than in Chapter 500 in the Insurance Code, and the Michigan's Department of Consumer and Industry Services, rather than the Michigan Insurance Bureau, regulates and has jurisdiction over the WDCA's administrative scheme. (Resp. to Crawford at 2-3; Supplemental Br. at 2.) However, the Court finds that this consideration, while relevant, is insufficient in itself to compel a finding that the WDCA does

24

not regulate the business of insurance.  Similarly, Plaintiffs' attempt to characterize the provision

of workers' compensation benefits as not comprising insurance is unpersuasive.  (Resp. to

Crawford at 1.)  Rather, the term "insurance" denotes "[a] contract whereby, for a stipulated

consideration, one party undertakes to compensate the other for loss on a specified subject by

specified perils."  Black's Law Dictionary 802 (6th Ed. 1990).  The WDCA simply deprives the

parties of their freedom of contract and, instead, imposes the benefits and burdens of the

predetermined bargain upon them.  The scope of that bargain–to "compensate . . . for the loss on

a specified subject by specified perils" or to compensate for work-related injuries here–remains

unchanged.

　　　　As to the last prerequisite, the Court concludes that the RICO Act would impair the

WDCA here.  As the Supreme Court held in *Humana Inc. v. Forsyth*, when the federal statute

does not "directly conflict" with the state law and "when application of the federal law would not

frustrate any declared state policy or interfere with a [s]tate's administrative regime," the federal

law does not "invalidate, impair, or supersede" the state law.  525 U.S. at 310.  According to the

Supreme Court, the term "invalidate" denotes "to render ineffective, generally without providing

a replacement rule or law," and the term "supersede" denotes "to displace (and thus render

ineffective) while providing a substitute rule."  *Id.* at 308 (internal quotation marks omitted)

(finding that the RICO Act would neither invalidate nor supersede Nevada insurance-fraud law).

　　　　The RICO Act and the WDCA do not directly conflict.  Rather, one could comply with

both the RICO Act and the WDCA.  Moreover, the termination of workers' compensation

benefits to which the employee is entitled would be actionable under the WDCA and, where part

of a fraudulent RICO enterprise, would be actionable under the RICO Act as well.  In other

words, the RICO Act would not proscribe conduct–i.e. the termination of workers' compensation benefits to which the employee is entitled–that the WDCA would permit or prescribe. Consequently, the application of the RICO Act in this case would neither "render ineffective " nor "displace" the WDCA or any claim under that Act. Thus, applying the RICO Act here would neither invalidate nor supersede the WDCA.

Rather, at issue is whether applying the RICO Act to this case would "impair" the WDCA. The Supreme Court held that the term "impair" denotes "[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner." *Humana,* 525 U.S. at 309-10 (internal quotation marks omitted). Moreover, as the Court noted, a federal law "impairs" a state law where it "frustate[s] any declared state policy or interfere[s] with a [s]tate's administrative regime." *Id.* at 310.

Analyzing *Humana* for the first time in reply, Crawford asserts that the application of the RICO Act in the instant case would "impair" the WDCA because the RICO Act, in affording treble damages and a private right of action, provides Plaintiffs greater recourse than that which the WDCA provides. (Crawford Reply at 2-3, Br. at 5; *See* Cassens Br. at 16.) In *Humana,* the Supreme Court addressed the issue of whether the RICO Act impairs Nevada insurance-law by providing materially-different remedies than that state law for purposes of the McCarran-Ferguson Act. 525 U.S. at 305. The court held that, although the RICO Act authorizes treble damages while Nevada's insurance-fraud law permits recovery of only compensatory and punitive damages, applying the RICO Act in that case would not impair the state law but, rather, would complement its remedial scheme. *Id.* at 313. Specifically, the Court noted that, based upon Nevada law's bad-faith exception to its punitive-damages cap, a plaintiff may be eligible

under state law for damages exceeding those under the RICO Act.  *Id.* at 313.

Here, Plaintiffs would not be eligible to receive damages equal to or exceeding those available under the RICO Act by virtue of an exception to the exclusive remedies that the WDCA provides.  *See* M.C.L.A. 418.131.  As discussed below, Plaintiffs' claims of intentional infliction of emotional distress surrounding Defendants' alleged fraudulent denial of Plaintiffs' workers' compensation benefits under Michigan law fail to state claims for which relief may be granted.

As the Court previously noted, the purpose of the WDCA "is to provide . . . not only for employees a remedy which is both expeditious and independent of proof of fault, but also for employers a liability which is limited and determinate."  *Simkins,* 453 Mich. at 710.  Thus, applying the RICO Act here to Plaintiffs' claims that Defendants fraudulently denied Plaintiffs' workers' compensation benefits so as to render Plaintiffs eligible for damages beyond those which the WDCA permits would turn on its head the policy balance that the Michigan legislature struck in the WDCA.  Indeed, employees would still receive the speedy and no-fault recovery of guaranteed compensation for work-related injuries under the WDCA, thereby reaping their respective benefits from that legislative balance.  However, imposing liability under the RICO Act upon employers beyond that which the WDCA permits robs those employers of the benefits that they are to receive from the WDCA's policy balance.[11]  To impose liability under the RICO Act upon employers' insurers of workers' compensation benefits or the claims' adjusters of those

_____

[11]Plaintiffs argue that applying the RICO Act would encourage employers to pay valid claims rather than to deny them fraudulently and, thus, would promote the WDCA's aim of ensuring employees' quick recovery of benefits.  (Resp. at 4.)  However, this argument ignores the other half of the bargain that the WDCA struck.

insurers, rather than the employers themselves, would still undermine the WDCA's policy

balance in that any such liability would ultimately be passed on to the employers in the form of

higher premiums.  Thus, the Court concludes that the WDCA reverse-preempts Plaintiffs' RICO

claims pursuant to the McCarran-Ferguson Act, 15 U.S.C. § 1012(b).  The Court, therefore,

DISMISSES Plaintiffs' RICO claims on this alternate ground.

### 5.  LMRA Preemption

The Labor Management Relations Act of 1947 ("LMRA") or § 301(a), 29 U.S.C. § 141

*et seq.*, governs the interpretation of collective bargaining agreements ("CBAs").  Section 301,

which provides a federal cause of action for a breach of a CBA, states in part:

> Suits for violation of contracts between an employer and a labor organization
> representing employees in an industry affecting commerce . . . may be brought in
> any district court of the United States having jurisdiction of the parties, without
> respect to the amount in controversy or without regard to the citizenship of the
> parties.

29 U.S.C. § 185(a).  "[S]ection 301 not only confers federal jurisdiction over controversies

involving . . . [CBAs], but also authorizes the federal courts to fashion a body of federal law for

the enforcement of section 301."  *Terwilliger v. Greyhound Lines, Inc.,* 882 F.2d 1033, 1036 (6th

Cir. 1989).  Moreover, to develop a uniform body of national labor law and "to avoid conflicts in

the interpretation of collective bargaining agreements," the federal law governing § 301

preempts state law.  *Id.*  Pursuant to this preemption doctrine, § 301 governs claims that directly

rely upon rights that arise from CBAs and claims that substantially hinge upon the analysis or

interpretation of collective bargaining agreements.  *Id.*

"[F]ederal labor policy requires that individual employees wishing to assert [labor]

contract grievances must *attempt* use of the contract grievance procedure agreed upon by the

employer and the union as the mode of redress." *Id.* at 1039 (internal quotation marks omitted; emphasis in the original). Additionally, unless the employee utilizes the contractual procedures for settling his labor-contract dispute, his independent suit in district court based upon that dispute must be dismissed. *Id.* (internal quotation marks omitted).

Relying upon exhibits attached to its pleadings, Cassens, in its motion to dismiss, maintains that § 301 of the LMRA preempts Plaintiffs' RICO claims. (Mot. at 2-3.) Cassens asserts that Plaintiffs, as union members, were subject to CBAs entitled National Master Automobile Transporters Agreement ("National CBA") and Central-Southern Area Supplemental Agreement ("Supplemental CBA"). (Br. at 1; Molter Aff., Ex. 1.) As Cassens notes, Article 41 of the National CBA provides:

> Physical, mental or other examinations required by . . . the Employer shall be promptly complied with by all employees.

> Examinations are . . . not to exceed one (1) in any one (1) year, except in emergencies or proven necessity.

> The Employer reserves the right to select its own medical examiner or physician, and the Union may, if it believes an injustice has been done an employee, have said employee reexamined at the Union's expense. If the two (2) doctors disagree, the Employer and the Union shall mutually agree upon a third (3rd) doctor whose decision shall be final and binding on both parties. The selection of the third (3rd) doctor shall be made within seven (7) days. The expense of the third (3rd) doctor shall be equally divided between the Employer and the Union.

> In those states where Workers' Compensation statutes or regulations do not permit an injured employee to select his/her own treating physician, the Employer shall provide a list or panel of no less than three (3) Board-certified physicians from which the employee may choose, unless prevented by state law.

> Employees are required to go to the doctor selected by the Employer.

(Art. 41, Ex. B) Cassens maintains that § 301 of the LMRA preempts Plaintiffs' RICO claims because they do not seek to vindicate a substantive right from a source other than Article 41 of

29

the National CBA.[12] (*Id.* at 11)

As an initial matter, "[t]he use of the term 'preemption' in this setting . . . has a dissonant ring to it." *Trollinger v. Tyson foods, Inc.,* 370 F.3d 602, 608, 611 (6th Cir. 2004). Making such an observation, the United States Sixth Circuit Court of Appeals opined:

> To say that federal courts . . . [may not] hear a claim under one federal act (RICO) because it is 'preempted' by another federal act . . . is not a natural use of the term 'preemption.' As federal courts generally use the term, preemption does not describe the effect of one federal law upon another; it refers to the supremacy of federal law over state law when Congress, acting within its enumerated powers, intends one to displace the other.

*Trollinger v. Tyson foods, Inc.,* 370 F.3d 602, 608, 611 (6th Cir. 2004) (internal quotation marks omitted). The Court further observed that a "cardinal principal of statutory construction" is that, "[w]hen there are two [federal] acts upon the same subject, the rule is to give effect to both." *Id.* (internal quotation marks omitted). According to the Court, "[a]bsent an intolerable conflict between the two statutes," courts are unwilling to construe the subsequent federal act as repealing any portion of the former federal act. *Id.* (internal quotation marks omitted).

In any event, Cassens relies upon materials that transcend the pleadings to support its contention that § 301 of the LMRA preempts Plaintiffs' RICO claims. Having already concluded that Plaintiffs' RICO claims fail as a matter of law, the Court declines, in its discretion, to treat the instant motion to dismiss under that rule as a motion for summary judgment pursuant to Rule 56 for purposes of adjudicating Cassens' contention that § 301 preemption affords another ground for summary dismissal of Plaintiffs' RICO claims.

### B. IIED CLAIMS

---

[12]*See e.g. Chicago District Council of Carpenters Pension Fund v. Ceiling Wall Sys., Inc.,* 915 F. Supp. 939 (N.D. Ill, 1996).

Plaintiffs' complaint, per Count VII, alleges that Defendants subjected each Plaintiff to the intentional infliction of emotional distress ("IIED") in violation of Michigan law.  In particular, Plaintiffs' complaint provides:

> Cassens . . . and Crawford . . . engaged in a 'continuous pattern of harassment, abuse, and unethical conduct,' as that phrase was used in *Hailes v. Liberty Mutual Ins. Co. . . .*, and also fraudulent conduct, intentionally inflicting emotional distress on plaintiffs and on other Cassens['] employees. . . . This conduct includes the acts alleged by each [P]laintiff in their complaints . . . .

(Compl. at ¶¶ 75-77.)

Having dismissed all claims over which the Court has original jurisdiction under Rule 12(b)(6) for failure to state claims for which relief may be granted,[13] the Court would normally decline to exercise pendent jurisdiction, under 28 U.S.C. § 1367, over Plaintiffs' IIED claims. *See Hankins v. The Gap, Inc.,* 84 F.3d 797 (6th Cir. 1996).  However, because the resolution of Plaintiffs' IIED claims is necessary to the Court's determination of whether the WDCA reverse-preempts Plaintiffs' RICO claims under the McCarran-Ferguson Act, as addressed above, the Court will exercise pendent jurisdiction over Plaintiffs' IIED claims.

Crawford maintains that Plaintiffs' IIED claims fail to state claims for which relief may be granted.  (Crawford Mot. at 2; Cassens Mot. at 22.)  While the Michigan Supreme court has yet to recognize formally the tort of IIED, it has described the elements that would be necessary to establish those claims.  *Roberts v. Auto Owners Ins. Co.,* 422 Mich. 594, 697, 603 (Mich. 1985).  Specifically, a plaintiff would have to demonstrate: 1) extreme and outrageous conduct;

---

[13]While Plaintiffs' complaint cursorily alleges that the Court has subject-matter jurisdiction under 28 U.S.C. § 1332, it fails, by virtue of Defendant Margules, to establish the complete diversity of citizenship that § 1332 requires.  *See Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 580 n.2 (1999).

31

2) intent or recklessness; 3) causation; and 4) severe emotional distress. *Roberts,* 422 Mich. at

602. As to the requisite extreme and outrageous conduct, the Court has adopted the following

standards that Restatement, Torts, 2d § 46, Commend D, sets forth:

> . . . [T]he conduct . . . [must be] so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency, and to be regarded as
> atrocious and utterly intolerable in a civilized community. Generally, the case is
> one in which the recitation of the facts to an average member of the community
> would arose his resentment against the actor, leaving him to exclaim,
> 'outrageous.'

*Id.* at 603.

Plaintiffs, in response, contend that their IIED claims rest upon Defendants' alleged

fraudulent denial of Plaintiffs' workers' compensation benefits. (Resp. to Crawford at 6.)

Plaintiffs further contend that, under *Broadus v. Ferndale Fastener Div.,* 84 Mich. App. 593

(1978) and *Atkinson v. Farley,* 171 Mich. App. 784 (1988), their IIED claims state claims for

which relief may be granted. (*Id.*) In *Atkinson,* the Michigan Court of Appeals held that "[a]n

insurer's wrongful, bad faith termination of benefits, by itself, is not sufficiently outrageous to

support a claim for intentional infliction of emotional distress." 171 Mich. App. at 790. The

Court held, however, that the plaintiff's complaint alleged an IIED claim for which relief could

be granted because it alleged the following:

> . . . [Defendants were in a position of control over [the] plaintiff's sole source of
> income, and knew that [the] plaintiff was extremely dependent upon the receipt of
> his [workers' compensation] disability benefits, yet abused their position by
> interfering with plaintiff's benefits, by ignoring the requirement to deal with his
> attorney, by threatening to cut off . . . [his] benefits, and by demanding that . . .
> [he] repay them a large sum of money. . . . [D]efendants were abusing their
> control of [the] plaintiff's income . . . to harass and intimidate him to gain
> economic benefit for the insurance company.

*Id.* at 791. In *Broadus,* the Michigan Court of Appeals held that the WDCA's exclusive-remedy

provision does not bar an action for the intentional infliction of emotional distress surrounding the defendants' alleged collusion in denying workers' compensation benefits where the essence of the tort and the damage alleged is non-physical, such as emotional and mental distress damages.  84 Mich. App. at 597, 600, 600 n.4 (holding that the plaintiffs were not seeking as damages compensation for workers' compensation benefits, and noting that the defendants, on remand, are still free to challenge particular damage claims on the ground that the WDCA renders them compensable so as to bar them under its exclusive-remedy provision).  As the Court of Appeals later clarified, *Broadus* never held that the failure to pay workers' compensation benefits based upon the facts there enabled the plaintiff to recover on his IIED claim.  *Lisecki v. Taco Bell Restaurants, Inc.,* 150 Mich. App. 749, 755 n.1 (1986).  Thus, contrary to Plaintiffs' assertion, neither *Atkinson* nor *Broadus* sustains a IIED claim based merely upon the fraudulent denial of workers' compensation benefits.  (Reply at 4, 6.)

Moreover, in *Hajciar v. Crawford & Co.,*the Michigan Court of Appeals even held that a claim that the defendant terminated the plaintiff's workers' compensation benefits to coerce the plaintiff into accepting a lump-sum payment that he had previously refused failed to state the requisite "extreme and outrageous" conduct and, thus, failed to state an IIED claim.  142 Mich. App. 632, 634, 639 (1985).  In *Lisecki v. Taco Bell Restaurants, Inc.,* the Court of Appeals held that "[t]he facts in *Hajciar* were essentially identical to those presented here, i.e., an allegation by the plaintiff that . . . [the defendant] wrongfully terminated [his compensation benefits] . . . to further some ulterior motive of the defendants rather than due to the plaintiff's" non-entitlement to those benefits.  150 Mich. App. at 755 (holding so where the plaintiff alleged that the defendant had colluded to claim falsely that the plaintiff's physician had informed the claims'

33

adjuster that the plaintiff had been released to work and where the plaintiff was later discharged from employment and denied workers' compensation benefits).  According to the Court, "such conduct simply cannot be characterized as outrageous and atrocious."  *Id.* (noting that the plaintiff had an adequate remedy for the termination of benefits with his WDCB claim).

Plaintiffs' complaint asserts that Defendants engaged in a "continuous pattern of harassment, abuse, and unethical conduct."  *See Hailes v. Liberty Mutual Ins. Co.,* No. 215509 (Mich. App. Dec. 28, 1999) (suggesting that "facts evidencing a continuous pattern of harassment, abuse, and unethical conduct" may constitute the requisite "extreme and outrageous conduct" for purposes of stating an IIED claim).  Yet, as Crawford aptly notes,  it fails to allege any facts that would evidence such conduct.  (Crawford Br. at 9.)  Rather, as Plaintiffs seemingly concede, the factual allegations underlying their IIED claims simply evidence Defendants' alleged fraudulent denial of Plaintiffs' workers' compensation benefits. (Resp. to Crawford at 6.)

Thus, Plaintiffs' IIED claims fail to state claims for which relief may be granted and are subject to dismissal under Rule 12(b)(6).[14]

### III. SUMMARY

For the preceding reasons, the Court:

1)      DISMISSES Plaintiffs' RICO claims because they fail to state claims for which relief may be granted, and because the WDCA reverse-preempts those claims under the McCarran-Ferguson Act; and

2)      DISMISSES Plaintiffs' state-law claims of intentional infliction of emotional

---

[14]In its motion to dismiss, Cassens maintains that § 301 of the LMRA preempts Plaintiffs' IIED claims because those claims arise from Article 41 of the National CBA and are "inextricably intertwined with" the interpretation of the terms of that CBA.  (Cassens Br. at 9.) Because Plaintiffs' IIED claims fail to state claims for which relief may be granted under Michigan law, the Court need not and does not reach this issue.

distress against Defendants for failure to state claims for which relief may be granted.

SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: July 15, 2005

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on July 18, 2005.


s/Jonie Parker
Case Manager

35