UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL BROWN, WILLIAM FANALY,
CHARLES THOMAS, GARY RIGGS,
ROBERT ORLIKOWSKI, and SCOTT WAY,

       Plaintiffs,

                              Case No. 04-cv-72316

v.

                              Paul D. Borman
                              United States District Judge

CASSENS TRANSPORT COMPANY,
CRAWFORD & COMPANY, foreign
corporations, and DR. SAUL MARGULES,

       Defendants.
_____/

OPINION AND ORDER
(1) GRANTING DEFENDANT CASSENS TRANSPORT COMPANY'S MOTION TO
DISMISS PURSUANT TO FED. R. CIV. P. 12(c) AND FOR PARTIAL SUMMARY
JUDGMENT (DKT. NO. 83);
(2) GRANTING DEFENDANT CASSENS TRANSPORT COMPANY'S
SUPPLEMENTAL MOTION TO DISMISS; (DKT. NO. 95);
(3) GRANTING DEFENDANT DR. SAUL MARGULES'
MOTION TO DISMISS (DKT. NO. 106);
(4) DENYING AS MOOT DEFENDANT CASSENS TRANSPORT COMPANY'S
RENEWED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 82);
(5) DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND (DKT. NO. 117); AND
(6) DISMISSING THIS CASE WITH PREJUDICE

This matter comes before the Court on Defendant Cassens Transport Company's ("Cassens")

Motions to Dismiss and for Partial Summary Judgment[1] and Supplemental Motion to Dismiss (Dkt.

_____

[1] Cassens' motion for partial summary judgment seeks to dismiss the claims of Plaintiff Gary Riggs based upon a release that Riggs executed in connection with his redemption of his workers compensation claims. Cassens filed a motion for leave to file a supplemental reply in support of its motion for partial summary judgment as to Riggs (Dkt. No. 105) attaching a transcript of Plaintiff Rigg's redemption hearing in which Riggs admits to releasing his RICO claim in this case. At the

1

Nos. 83 and 95) and on Defendant Dr. Saul Margules' ("Margules") Motion to Dismiss (Dkt. No.

106.)[2] Also before the Court is Plaintiffs' Motion for Leave to File First Amended Complaint. (Dkt.

No. 117.)  The Court held a hearing on these matters on September 15, 2010.  For the reasons that

follow, the Court GRANTS Defendants' motions to dismiss and DENIES Plaintiffs motion for leave

to amend.

**INTRODUCTION**

Plaintiffs allege that they were deprived of benefits due to them under the provisions of the

Michigan Workers' Disability Compensation Act ("WDCA"), Mich. Comp. Laws § 418.101 *et seq.*

They allege that through various acts of mail and wire fraud, and in violation of the Racketeer

Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. §1964(c), Defendants perpetrated

a scheme to deny them workers' compensation benefits.  The essence of the alleged scheme is that

---

hearing on this matter on September 15, 2010, Plaintiffs' counsel informed the Court that Plaintiff Riggs is withdrawing his claims in this case. Because the Plaintiffs have indicated that they are withdrawing Riggs' claims in this case and because the Court in any event finds that Riggs' release clearly and unequivocally covers and releases the claims he asserts in this action, *see Cole v. Ladbroke Racing Michigan, Inc.*, 241 Mich. App. 1, 13 (2000) (a clear and unambiguous release must be given its plain and ordinary meaning), the Court  need not consider Cassens' additional motion for leave to supplement its reply (Dkt. No. 105) and denies that motion as moot.

[2]  Both Defendant Crawford & Company (Dkt. No. 88) and Defendant Margules (Dkt. No. 87) joined and concurred in Cassens' motion to dismiss (Dkt. No. 83).  Both Defendant Crawford (Dkt. No. 100) and Defendant Margules (Dkt. No. 101) also joined in Cassens' Supplemental Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 95) (bringing to the Court's attention the decision of District Court Judge Nancy G. Edmunds in *Jackson v. Sedgwick Claims Mgt.*, No. 09-11529, 2010 WL 931864 (E.D. Mich. March 11, 2010).  Defendant Margules also filed his separate Motion to Dismiss (Dkt. No. 106).  Defendant Crawford has not filed a separate motion to dismiss and relies on the arguments made in Cassens's motions in seeking dismissal of Plaintiffs' Complaint. Cassens also filed a Motion for Summary Judgment Based on Preemption by § 301 of the Labor Management Relations Act addressing only the issue of preemption under the LMRA (Dkt. No. 82) in which Crawford (Dkt. No. 88) and Margules (Dkt. No. 87) joined and concurred.  Because the Court dismisses Plaintiffs' claims on other grounds, it will not address the merits of Cassens' arguments regarding preemption under the LMRA and will deny the motion as moot.

Cassens Transport Company ("Cassens") (Plaintiffs' employer which was self-insured) and Crawford & Company ("Crawford") (which served under contract as the claims adjuster for Cassens's workers' compensation claims) deliberately selected unqualified doctors, including Defendant Dr. Saul Margules ("Margules"), to give erroneous medical opinions that would support fraudulent denials of workers' compensation benefits.   Four of the six Plaintiffs allege claims against all Defendants (Fannaly, Brown, Orlikowski and Way, all of whom were seen by Defendant Margules) and two of the six allege claims only against Defendants Cassens and Crawford (Thomas and Riggs, neither of whom was seen by Defendant Margules).   Plaintiffs each claim monetary damages as a result of the wrongful denial of their statutory workers' compensation benefits, "measured by the amount of benefits improperly withheld from him, plus interest as provided by law, all tripled in accordance with RICO, together with attorney fees and costs provided by law."[3]

Defendants respond that Plaintiffs are impermissibly attempting to bypass the exclusive administrative scheme for recovery of benefits embodied in the WDCA and that, even assuming a claim outside that statutory scheme is viable, Plaintiffs cannot establish several essential elements of a RICO claim including (1) an injury which is compensable under RICO, and/or (2) the existence of a RICO enterprise.   Additionally, Defendant Cassens argues that the claims against it are preempted by the Labor Relations Management Act ("LMRA") and Defendant Margules argues that

---

[3] Plaintiffs Complaint also makes a veiled allegation that Defendants committed the predicate act of witness tampering under 18 U.S.C. § 1512.   As this Court noted in its December 19, 2007 Opinion and Order Adopting in Part and Rejecting in Part the Magistrate Judge's Report and Recommendation in Favor of Awarding  Nine Hours of Attorney Fees and Denying Plaintiffs' Cross-Motion for Sanctions (Dkt. No. 66), Plaintiffs' counsel is well aware that any such claim lacks legal merit, that the Complaint does not and cannot allege an "official proceeding," and that the claim is frivolous.   To the extent, if at all, that Plaintiffs continue to press this claim, the Court dismisses Plaintiffs' RICO claims to the extent that they purport to rely on violations of the federal witness tampering statute as predicate acts.

Plaintiffs cannot establish that he "conducted the affairs" of the alleged RICO enterprise.

The Court concludes that Plaintiffs' exclusive remedy for their claim that they were fraudulently denied benefits under the WDCA lies within the exclusive administrative scheme set forth in the WDCA, which forecloses their RICO claim. The Court further concludes that even assuming such a claim could be raised outside of the WDCA's exclusive administrative framework, Plaintiffs have failed to allege an "injury to business or property" as that term is defined under RICO and their claims thus fail for this separate and independent reason. Finally, the Court concludes that, even assuming that Plaintiffs' Complaint stated a cognizable claim under RICO, the Court would abstain from deciding Plaintiffs' claims and would stay proceedings pending a final WDCA administrative determination of Plaintiffs' entitlements to workers compensation benefits.[4]

## I.    BACKGROUND

### A.    Procedural History

On July 15, 2005, this Court entered an Opinion and Order Granting Defendants' Motions to Dismiss Plaintiffs' Complaint Under Rule 12(b)(6). (Dkt. No. 39) This Court ruled that Plaintiffs' RICO claims failed to allege the "key requirement" of reliance and therefore, failed to state a claim for which relief could be granted. *Brown v. Cassens Transport Co.*, 409 F. Supp. 2d 793, 808 (E.D. Mich. 2005) ("*Brown I*"). Plaintiffs appealed this ruling which was affirmed, based upon established Sixth Circuit precedent requiring proof of detrimental reliance, in *Brown v. Cassens Transport* Co., 492 F.3d 640, 646 (6th Cir. 2006) ("*Brown II*"). In *Brown I*, this Court also

---

[4] Because the Court is dismissing Plaintiffs' RICO claims on the grounds addressed in this Opinion and Order, it need not reach the merits of Defendants' arguments that Plaintiffs (1) have failed to plead and prove the existence of a RICO enterprise, and (2) have failed to adequately plead Dr. Margules' participation in the conduct of the affairs of the enterprise.

dismissed Plaintiffs' RICO claims on the alternate ground that they were reverse preempted by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b). *Id*. at 811. In *Brown II*, the Sixth Circuit did not address this alternative ground for dismissal, invoking its authority to "affirm the district court on any ground supported by the record." *Brown II*, 492 F.3d at 646 n. 5.

The United States Supreme Court granted Plaintiffs' petition for a writ of certiorari, vacated the judgment of the Sixth Circuit in *Brown II*, and remanded the case to the Sixth Circuit for reconsideration in light of *Bridge v. Phoenix Bond & Indemnity Co*., 128 S. Ct. 2131 (2008), which established that a civil-RICO plaintiff need not show detrimental reliance on the defendant's alleged misrepresentations. On remand, the Sixth Circuit reversed this Court's dismissal of Plaintiffs' claims in *Brown I*, and remanded for further proceedings, holding: (1) that the WDCA does not preempt Plaintiffs' RICO claims and (2) that Plaintiffs had "sufficiently pleaded a pattern of racketeering activity under RICO given that reliance is not an element of a civil RICO fraud claim." *Brown v. Cassens Transport Co*., 546 F.3d 347, 351 (6th Cir. 2008) ("*Brown III*").[5] Defendants now file the instant motions to dismiss and for partial summary judgment.

### B.    Plaintiffs' Claims

Plaintiffs claim that Defendant Cassens, who employed each of the Plaintiffs, and Defendant Crawford, who adjusted workers' compensation claims on behalf of Cassens, formed an enterprise for purposes of RICO and fraudulently denied Plaintiffs' claims for benefits under the WDCA, in

---

[5] Plaintiffs also alleged in their Complaint a claim against Cassens and Crawford for Intentional Infliction of Emotional Distress ("IIED"). This Court previously dismissed Plaintiffs' IIED claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Brown* I, 409 F. Supp. 2d at 815. The Sixth Circuit affirmed dismissal of this claim in its two subsequent opinions, *Brown II*, 492 F.3d at 647 and *Brown III*, 546 F.3d at 364. Thus, Plaintiffs only remaining claims for damages in this lawsuit are for workers' compensation benefits that they allege were due them under the WDCA, plus interest, all trebled under RICO, plus attorney's fees.

part through violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, which allegedly form the predicate acts for Plaintiffs' RICO claim. (Compl. ¶¶ 4-6A.) Four of the six Plaintiffs, Fanaly, Brown, Orlikowski and Way, claim in addition that Defendant Margules, described by Plaintiffs as a "cut-off" doctor, was part of the enterprise in that he provided false and fraudulent medical opinions to Defendant Cassens and/or Crawford, which were then used to deny Plaintiffs' claims for workers' compensation benefits. (Compl. ¶ 6B.) Plaintiffs allege that in these fraudulent communications, "defendant and the IME 'cut-off' doctors whose reports defendants relied upon in terminating or denying plaintiffs' benefits . . . discussed means of cutting off plaintiffs' benefits or forcing them to take settlements at less than true value, even though defendants possessed medical reports from treating doctors and doctors chosen by defendants stating plaintiffs did have work-related disabilities." (Compl. ¶ 6D.) Plaintiff Brown appealed his denial of benefits and was awarded benefits by the Workers Disability Compensation Board ("WDCB"). The remaining Plaintiffs do not allege that they appealed their denial of benefits.

The alleged predicate acts which are specifically referenced in the Complaint are either Notices of Dispute sent from Crawford to Plaintiffs, in which Crawford challenged the validity of the claim as being unsupported by medical evidence or not job related, or opinion letters sent from Margules to Plaintiff and/or Cassens and/or Crawford, opining that his examination revealed that the alleged injury was not job related or not sufficiently disabling. Plaintiffs also make several non-specific allegations regarding additional "communications" in furtherance of the scheme, without expressly identifying the means of communication, the speaker/author or recipient, or the specific date of the alleged communication.

### 1.    Plaintiff Fanaly

Plaintiff Fanaly alleges that on December 14, 2001, he injured his right foot while walking to his Cassens car-hauling truck.[6] He reported the injury to "defendants" and his claim was denied by Crawford's claim adjuster, Tina Litwiller, on December 19, 2001 as being not job related. (Compl. ¶ 8.) Fanaly alleges that this denial was fraudulent because "the corporate defendants knew that an injury which happens to an employee while he is leaving his motel during the course and scope of his employment is an injury which is compensable under the Act." (Compl. ¶ 9.)

On February 17, 2002, Fanaly alleges that he dislocated his left shoulder while loading his Cassens car-hauling truck and filed a claim for benefits under the WDCA. Fanaly further alleges that "Defendants" sent him to Dr. Margules for an examination. Fanaly alleges that "defendants expressly or impliedly communicated to Dr. Margules that it wanted him to write reports stating plaintiff was not disabled due to work-related injuries, regardless of the true circumstances." (Compl. ¶¶10-12.) Fanaly alleges that sometime "in February or March, 2002, Margules opined to defendants that plaintiff had no job-related disability relating to his shoulder." On February 21, 2001, Tina Litwiller sent Fanaly a Notice of Dispute which stated that the "condition is chronic - per Dr. Marglious [sic]." (Compl. ¶¶ 13-14.) Fanaly alleges that this statement was fraudulent because "chronicity of a condition is not a legal basis for denial of benefits . . . and because plaintiff's treating surgeons opined, based on what they saw in exams and during surgery, that plaintiff's pathology was work-related." (Compl. ¶ 16.) Fanaly claims that he "relied on the fraudulent communications to the extent he suffered the financial loss of having to pay attorney fees, medical care and medical mileage" and was injured because he was "deprived of workers compensation benefits" and "caused him the expense of paying attorney fees, medical care and

---

[6] Cassens is in the business of hauling automobiles for new car manufacturing facilities.

7

mileage to and from medical care." (Compl. ¶ 17.)

### 2. Plaintiff Thomas

Plaintiff Thomas claims that on April 16, 2001, he tore his rotator cuff while working for Cassens and filed a workers compensation claim with Crawford and Cassens. Thomas alleges that despite having possession of a physician's statement dated December 13, 2001 regarding the incident, Tina Litwiller filed a Notice of Dispute of the claim on or about January 21, 2002, stating "no medical establishing causation." (Compl. ¶¶ 22-23.) Thomas claims that this statement was fraudulent because Litwiller possessed a medical statement establishing causation. Thomas claims that he "relied on the fraudulent communications to the extent he suffered the financial loss of having to pay attorney fees, medical care and medical mileage" and was injured because he was "deprived of workers compensation benefits" and "caused him the expense of paying attorney fees, medical care and mileage to and from medical care." (Compl. ¶25.)

### 3. Plaintiff Brown

Plaintiff Brown claims that on April 12, 2000, he injured his left knee while climbing off of a Cassens' car hauler. Plaintiff Brown further claims that on February 15, 2002, he injured his shoulders pulling down on a tie-bar and later that day injured his knee. He filed a claim for workers compensation benefits and was sent to Dr. Margules for an examination. (Compl. ¶¶ 30-32.) Brown alleges that "defendants expressly or impliedly communicated to Dr. Margules that it wanted him to write reports stating plaintiff was not disabled due to work-related injuries, regardless of the true circumstances." (Compl. ¶ 32.) Brown alleges that his treating orthopedic surgeons, Drs. Pinto and Page, operated on Brown's knees and shoulders and wrote reports stating that Brown had job-related disabilities due to the condition of his knees and shoulders. (Compl. ¶ 33.) Brown alleges that

8

"Margules opined to the other defendants that plaintiff had no job-related disability" and that Tina Litwiller mailed a Notice of Dispute on March 19, 2002 stating that the "medical condition was not job related." Brown alleges that this statement was fraudulent. (Compl. ¶¶ 34-35.) Brown claims that he "relied on the fraudulent communications to the extent he suffered the financial loss of having to pay attorney fees, medical care and medical mileage" and was injured because he was "deprived of workers compensation benefits" and "caused him the expense of paying attorney fees, medical care and mileage to and from medical care." (Compl. ¶ 38.)

Brown appealed the denial of benefits and on March 30, 2003, the magistrate awarded benefits to Brown. Defendants appealed the magistrate's ruling but were required to pay Brown benefits while the appeal was pending. Brown alleges that Defendants ultimately paid the benefits but only after Brown filed a motion to have the benefits paid during the appeal. (Compl. ¶¶ 39-41.) Brown alleges that this additional fraudulent refusal to pay full benefits during the appeal "caused him the expense of paying attorney fees, medical care and mileage to and from medical care." (Compl. ¶ 42.)

### 4.     Plaintiff Orlikowski

Plaintiff Orlikowski injured his left knee on or about November 6, 2000 while employed as a car-hauler by Cassens. Orlikowski alleges that the injury was caused by trauma suffered that day and/or by aggravation caused by years of car-hauling work for Cassens, and from degenerative arthritis from a 1980 injury to his left knee that did not occur while working for Cassens. (Compl. ¶ 55.) Orlikowski filed a claim and was sent for an examination to Dr. Margules who opined that Orlikowski could return to work without restriction. On or about November 8, 2000, Margules allegedly reported to Cassens and Crawford that Orlikowski's injuries were not work related.

Orlikowski claims that this statement was fraudulent. (Compl. ¶¶ 56, 57.) On November 21, 2000, Tina Litwiller sent Orlikowski a Notice of Dispute denying benefits on the ground that the injury was not work related "based on opinion of authorized physician [sic]." Orlikowski claims that this statement was fraudulent because Cassens and Crawford knew Orlikowski's injury was compensable. (Compl. ¶ 58.) Orlikowski claims that he provided Cassens and Crawford with further medical evidence of his condition but they "continued in their scheme to deny benefits." (Compl. ¶¶ 59-60.) Orlikowski claims that he "relied on the fraudulent communications to the extent he suffered the financial loss of having to pay attorney fees, medical care and medical mileage" and was injured because he was "deprived of workers compensation benefits" and "caused him the expense of paying attorney fees, medical care and mileage to and from medical care." (Compl. ¶ 61.)

## 5.    Plaintiff Way

Plaintiff Way alleges that on March 12, 2002, he hurt his lower back at work when he fell off a truck and that increased stiffness in his back caused him to stop work on June 11, 2002. He filed a claim and was sent on June 12, 2002 to Dr. Margules for an examination. (Compl. ¶¶ 66-68.) On June 19, 2002, Dr. Margules sent a report to Tina Litwiller concluding that Way's disc herniation was not related to the work-related incidents. Way claims that this report was fraudulent because Margules knew that the disc herniation may have been aggravated by the work-related incidents and therefore compensable. (Compl. ¶68.) On July 29, 2002, Tina Litwiller mailed to Way a Notice of Dispute denying benefits "[b]ased on Dr. Margules' 6/19/02 report and opinion . . ." Way claims that this statement was fraudulent because Litwiller knew Way's injury qualified him for workers compensation benefits.   (Compl. ¶ 69.)   Way claims that he "relied on the fraudulent

10

communications to the extent he suffered the financial loss of having to pay attorney fees, medical care and medical mileage" and was injured because he was "deprived of workers compensation benefits" and "caused him the expense of paying attorney fees, medical care and mileage to and from medical care." (Compl. ¶ 70.)

### C.    Plaintiffs' Damages

Plaintiffs claim that they were injured by Defendants' alleged RICO violations in that they were deprived of workers' compensation benefits, and incurred attorneys' fees, medical care expenses and mileage to and from medical care.  (Compl. ¶¶ 17, 25, 38, 42, 61, 70.)  As to each Plaintiff's RICO claim, the *ad damnum* clauses is identical: "[P]laintiff demands judgment against defendants [or against Cassens and Crawford only in the case of Plaintiffs Thomas and Riggs, who were not examined by Margules] for damages measured by the amount of benefits improperly withheld from him, plus interest as provided by law, all tripled in accordance with RICO, together with attorney fees and costs as provided by law."  (Compl. pp. 8, 10-11, 16, 18-19, 22-23, 26.)

## II.    STANDARDS OF REVIEW

### A.    Federal Rule of Civil Procedure 12(b)(6) and 12(c)

The standards for reviewing motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are the same as those applied in considering motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  *Sensations, Inc. v. City of Grand Rapids*, 487 F.3d 471, 476 (6th Cir. 2008).  Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."

*DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id*. (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Id*. at 555 (internal citations omitted). Dismissal is only appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face.  *Id.* at 570.  The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id*. at 1948-50.  A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

12

In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted).

### B.    Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action

or defense asserted by the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e). The rule requires the  non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

14

## III.   ANALYSIS

### A.   The WDCA Sets Forth the Exclusive Administrative Scheme for the Resolution of Plaintiffs' Claims for Wrongful Denial of Their Workers Compensation Benefits, Foreclosing Plaintiffs' RICO Claims[7]

The gravamen of Plaintiffs' Complaint is that Defendants failed to abide by their statutory duty under the WDCA to provide benefits for claimed work place injuries.  Plaintiffs seek "damages measured by the amount of benefits wrongfully withheld" described as "the expense of paying attorney fees, medical care and mileage to and from medical care."  These are the very damages for which compensation is provided under the WDCA.  Regardless of how Plaintiffs frame their claim, a conclusive finding that Plaintiffs were wrongly denied workers compensation benefits is essential to their theory and resolution of such workers compensation benefits claims has been firmly vested in the comprehensive administrative enforcement scheme embodied in the WDCA.[8]

---

[7] In its opinion in *Brown III*, the Sixth Circuit concluded that Plaintiffs had stated a sufficient number of predicate acts, and a sufficient relatedness and continuity among those acts, to satisfy those aspects of the "pattern" requirement under RICO.  546 F.3d at 353-355.  Defendants do not challenge these elements of Plaintiffs' RICO claims in the motions *sub judice*.  The Sixth Circuit also concluded, in dicta, that Plaintiffs had sufficiently alleged that they were injured "by reason of" the alleged pattern because they suffered loss of benefits in addition to costs related to medical care expenses and attorney fees.  *Id*. at 355-356.  *Cf.* Compl. ¶ 61.  While the Sixth Circuit thus opined on the issue of proximate cause, it did not specifically address the issue, discussed *infra*, of whether the nature of the injury, i.e. monetary compensation for physical injuries, constitutes a compensable injury under RICO.

[8] In *Jackson v. Sedgwick*, No. 09-cv-11529, 2010 WL 931864 (E.D. Mich. March 11, 2010), Judge Edmunds, on indistinguishable facts, reached this same conclusion and dismissed Plaintiffs' RICO claims, holding that plaintiffs "may not avoid the WDCA's comprehensive procedures and exclusive remedies simply by characterizing a denial of benefits as 'fraudulent.'" 2010 WL 931864 at * 18.

1.    **The WDCA establishes a comprehensive and exclusive administrative scheme, addressing every aspect of the recovery of workers' compensation benefits, including a detailed set of procedures for determining disputed claims for benefits, even those alleged to have been denied in bad faith, and does not allow for a private right of action.**[9]

An injured employee seeking workers' compensation benefits must utilize the WDCA's comprehensive administrative process and has no private right of action for such benefits: "The right to recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort." Mich. Comp. Laws § 418.131. When Michigan adopted the WDCA it essentially created a "no-fault" system under which a worker no longer has to establish negligence on the part of the employer but the employer is liable for certain expenses related to an injury suffered on the job without regard to fault. As this Court has previously noted, "the purpose of the WDCA is to provide . . . not only for employees a remedy which is both expeditious and independent of proof of fault, but also for employers a liability which is limited and determinate." *Brown I*, 409 F. Supp. 2d at 811 (internal quotation marks and citations omitted). The exclusive remedy provision is an essential part of this important balance struck by the Legislature in adopting the WDCA; the provisions of the WDCA cover every aspect of Plaintiffs' claims for wrongful denial

---

[9] With respect to Dr. Margules' statement that he is a treating physician covered by the WDCA (*see* Margules' Mot. to Dismiss, Dkt. No. 106, pp. 9-11), the Court need not decide this issue in light of the Court's alternative holding that Plaintiffs have failed to allege an injury compensable under RICO. However, the Court notes that Plaintiffs appear to concede this issue by acknowledging that Dr. Margules conducted his examinations pursuant to Mich. Comp. Laws § 418.385 (*see* Pls.' Resp. to Margules' Mot. to Dismiss, Dkt. No. 112, p. 15), which by its terms subjects Dr. Margules at the very least to potential cross examination under oath: "Any physician who makes or is present at any such examination may be required to testify under oath as to the results thereof." Mich. Comp. Laws § 418.385. Further, Mich. Comp. Laws § 418.315(6), which Dr. Margules asserts governs his conduct, provides both civil and criminal penalties for the submission of false or misleading records to the carrier or the workers' compensation agency.

16

of their benefits.

The WDCA provides that: "Compensation shall be paid promptly and directly to the person entitled thereto and shall become due and payable on the fourteenth day after the employer has notice or knowledge of the disability or death, on which date all compensation then accrued shall be paid. Thereafter compensation shall be paid in weekly installments." Mich.Comp.Laws. § 418.801(1).   The WDCA further provides that weekly benefits, in the absence of a dispute over a claim, must be paid within thirty days of when the claim becomes due and owing and employers must pay a penalty of $50 per day, with a maximum penalty of $1,500, for failure to timely pay such benefits.  Mich. Comp. Laws § 418.801(2).

An insurer can delay the payment of benefits by filing a timely Notice of Dispute. *Richardson v. GMC*, 139 Mich. App. 727 (1984).  Michigan law is clear that a timely filed notice of dispute will relieve the employer's obligation to pay benefits without regard to whether the claim is disputed in bad faith or for legitimate reasons.  *Warner v. Collavino Bros*., 133 Mich. App. 230, 236-237 (1984) (affirming an administrative decision refusing to assess a penalty and holding that section 418.801(2) "merely requires an 'ongoing dispute' and does not distinguish good faith disputes from bad faith or unreasonable disputes"); *Couture v. General Motors Corp*., 125 Mich. App. 174, 178-179 (1983) (reversing a penalty award above the statutory limit, finding that the Legislature intended to limit liability for failures to pay benefits, even those failures to pay that are motivated by bad faith).

A disputed claim for benefits is first reviewed by a mediator, or at a hearing before a workers compensation magistrate.  Mich. Comp. Laws § 418.847.  The statute provides that the parties may seek review of the magistrate's decision by the Workers Compensation Appellate Commission.

Mich. Comp. Laws § 418.859(a). Finally, the decision of the WCAC is subject to judicial review. Mich. Comp. Laws § 418.861(a). If the magistrate's decision awards benefits to the worker, the worker is entitled to begin receiving benefits immediately, even though the employer may chose to appeal the magistrate's decision. In fact, this process was followed successfully by Plaintiff Brown, who appealed his denial and was awarded benefits by the magistrate and paid those benefits during the appeal process.

The WDCA contains its own procedures for policing abuses of the obligations imposed to timely pay benefits. First, under Mich. Comp. Laws 418.631(2), a self-insurer, like Cassens, can lose its privilege to self-insure if it "repeatedly or unreasonably fails to pay promptly claims for compensation for which it shall become liable." Also, under section 418.861b, the WCAC may dismiss a claim submitted for review, and assess costs and take other disciplinary action if it determines that the claim is proceeding vexatiously or was taken without a reasonable basis for believing that the claim had merit. Further, "[t]he bureau may appoint a duly qualified impartial physician to examine the injured employee and to report." Mich. Comp. Laws § 418.865. Thus, the WDCA does address the "fraudulent" denial of benefits and Michigan Courts have routinely held that such claims belong exclusively before the WDCB and the WCAC, with the ultimate availability of judicial review.

Plaintiffs argue that reliance on these procedures is misplaced because "there is no provision for proving or punishing fraud which occurs at the claims stage (before a proceeding is filed with the Agency), or during the pendency of proceeding." (Pls.' Resp. to Supp. Mot., Dkt. No. 102 at 7.) However, Michigan courts have expressly rejected this argument, in refusing to assess penalties against employers for bad faith denials of benefits:

18

M.C.L. § 418.801(2); M.S.A. § 17.237(801)(2) does not, by its own terms, grant the WCAB the power to make a qualitative determination of the merits of a defense for the purpose of assessing a penalty.  The statute simply provides that there must be no ongoing "dispute." . . . We cannot read the term "dispute" . . . to mean only a meritorious or nonfrivolous dispute. . . . We note the possible salutary effect of a penalty provision in deterring the bad faith failure to pay meritorious claims.  The Legislature had expressly put such provision into no-fault insurance law.  See M.C.L. § 500.2006(4); M.S.A. § 24.12006(4).  However, in the absence of such an express provision in the workers' compensation law, we must hold that the penalty provision M.C.L. § 418.801(2); M.S.A. § 17.237(801)(2), is limited in its application to 30 days following the 14 days after the injury if no dispute is made to the compensation bureau.

*Couture,* 125 Mich. App. at 178-179.  *See also Warner,* 133 Mich. App. at 236-237 ("From our reading of similar statutes, we infer that the Legislature was aware that prompt payment of compensation benefits could be encouraged by imposing a penalty for the bad faith denial of payments."  Holding that the Legislature's failure to so provide precluded the assessment of a penalty for bad faith denials.).

Similarly, as the Sixth Circuit noted in both *Brown II* and *Brown III*, Michigan courts have routinely denied claims based upon allegedly tortious denial of workers' compensation benefits.  *See Brown* II, 492 F.3d at 647 and *Brown III,* 546 F.3d at 364, citing *Lisecki v. Taco Bell Restaurants, Inc.,* 150 Mich. App. 749, 755 (1986) (holding that bad faith denials of claims for benefits under the WDCA, even those based upon some ulterior motive of the employer, while calling into serious question the employer's business practices, cannot support an independent claim for tortious denial of benefits, concluding that: "An adequate remedy for the defendants' termination of benefits was available to and exercised by Plaintiff Lisecki, *i.e.* his filing of a petition for hearing with the Bureau of Worker's Disability Compensation, which resulted in an open award of benefits.") *See also Wright v. DaimlerChrysler Corp.,* 220 F. Supp. 2d 832, 845 (E.D. Mich. 2002) ("[W]rongful, even *bad faith* refusal to offer benefits to which Plaintiff is entitled is not tortious.") (emphasis in

19

original).[10]  "At most, the dilatory handling of plaintiffs' claim constitutes 'bad faith' justifying imposition of the statutory penalties set forth above, but for which this Court has held no separate cause of action can lie."  *Lisecki,* 150 Mich. App. at 754 (quoting *Roberts v. Auto-Owners Ins. Co.,* 422 Mich. 594, 607-608 (1985) (discussing bad faith handling of claims in the context of the denial of no-fault benefits)).

This same reasoning has been employed by courts interpreting the provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA") which, though a federal statute, contains similar exclusivity and penalty provisions to those in the WDCA.  In *Atkinson v. Gates, McDonald & Co.,* 838 F.2d 808 (5th Cir. 1988), the court examined plaintiff's claims, essentially sounding in intentional infliction of emotional distress, that her employer's insurance carrier had wrongfully and fraudulently terminated her disability compensation benefits without notice or explanation.  *Id.* at 809.  Plaintiff filed a claim to have her benefits reinstated, following the procedures of the LHWCA and ultimately was awarded benefits.  Her employer, who had not timely disputed the claim before terminating benefits, was assessed a penalty.   Plaintiff then filed suit, claiming that the termination of benefits had been wilful and in bad faith and claimed damages for mental and emotional distress.  Affirming the district court's dismissal of plaintiff's claims based upon the exclusivity provision of the LHWCA, the court observed:

> Under the scheme established in [the LHWCA], the employer has the unfettered right to controvert a claim for compensation and, if the employer does so, no compensation is due until an award is made.  There can be no *wrongful* failure to pay

---

[10]  As the court noted in *Wright*, claims for tortious denial of benefits seeking to recover as damages the workers compensation benefits denied, the claims Plaintiffs make in the instant case, are to be distinguished from claims for recovery of damages for intentional infliction of emotional distress, which Michigan courts have allowed to proceed only in extreme cases.  *Wright,* 220 F. Supp. 2d at 845 n. 9.  The Sixth Circuit has twice affirmed this Court's prior holding that Plaintiffs cannot state such a claim on the facts of this case. *Brown II,* 492 F.3d at 647; *Brown III,* 546 F.3d at 364.

compensation when no compensation is due.  If as in this case, there has been no timely controversion, then the penalty for pre-award failure to pay compensation is that fixed by section 14(e), and no other penalty is provided for, except that if an award is entered attorneys' fees may also be ordered under section 28.  As the district court aptly observed:

> Since the Act itself provides not only for payment of benefits, but also for redress in the event of nonpayment of benefits, and further does not distinguish between good faith and bad faith nonpayment of benefits, the apparent intent of the Act is that the penalty provisions provide the exclusive remedy for late payment or nonpayment of benefits.

838 F.2d at 808 (internal quotation marks and citation omitted) (emphasis in original).  The court affirmed the district court's ruling that plaintiffs' sole avenue of relief was the exclusive administrative process set forth in the LHWCA.  Rejecting the notion that the LHWCA penalty provisions did not fully compensate Plaintiff, the court observed: "'[A]lthough the penalties may in some instances be inadequate, this does not, within the overall nature of the compensation concept, make them invalid. At most, it may be cause to apply to the legislature for a more suitable penalty level.'"  838 F.2d at 814 (quoting 2A Larson, *Workmen's Compensation Law* § 68.34(c) (1987) at 13-145-146 *now at* 6-104 Larson's Workers' Compensation Law § 104.05 [3] (2010)).

Some courts have allowed departures from exclusive workers' compensation schemes in rare instances where the defendant's behavior has been found to be particularly heinous and where plaintiffs sought damages not for their lost benefits and related expenses but for emotional and mental distress separate and apart from the underlying claim for benefits.[11]  Reserving departure

---

[11]   Michigan courts have recognized a claim for intentional infliction of emotional distress in connection with an insurer's outrageous wrongful termination or denial of workers' compensation benefits. In *Broaddus v. Ferndale Fastner Division*, 84 Mich. App. 593 (1978), the court construed plaintiff's claim, which sought damages only for emotional and mental injury and not compensation for the benefits denied, and *Atkinson v. Farley*, 171 Mich. App. 784 (1988), the courts found that defendants' conduct was the type of "extreme and outrageous" behavior necessary to state a claim of intentional infliction.  In *Wright*, the court distinguished both *Broaddus* and *Atkinson* on this very basis and concluded that these decisions did not justify a departure from the exclusive administrative

from the exclusive administrative scheme only in such extreme cases comports with the most

fundamental precepts of the workers' compensation scheme, as recognized by Professor Larson in

his classic treatise on workmen's compensation law:

> It seems clear that a compensation claimant cannot transform a simple delay in
> payments into an actionable tort by merely invoking the magic words "fraudulent,
> deceitful and intentional" or "intentional infliction of emotional distress" or
> "outrageous" conduct in his complaint.  The temptation to shatter the exclusiveness
> principle by reaching for the tort weapon whenever there is a delay in payments or
> a termination of treatment is all too obvious, and awareness of this possibility has
> undoubtedly been one reason for the reluctance of courts to recognize this tort except
> in cases of egregious cruelty or venality.

6-104 Larson's Workers' Compensation Law § 104.05 [3] (2010).   Quoting this passage from

Professor Larson's treatise in *Sample v. Johnson*, 771 F.2d 1335 (9th Cir. 1985), another case

interpreting the parallel provisions of the LHWCA, the court distinguished intentional infliction

claims, which are "conspicuously contemptible," from all other denials or terminations of benefits:

> The bulk of authority in cases involving ordinary refusals to pay is *contra*. One
> reason is that most worker's compensation statutes, like the LHWCA, have penalty
> provisions for wrongful failure to pay. . . .   While it may be that the penalty
> provisions are inadequate to fully compensate a worker who has been harmed by an
> employer's refusal to pay when due, the problem requires a political solution.

771 F.2d at 1347.   As this Court previously held, and as the Sixth Circuit twice confirmed, this case

simply does not present allegations of such "cruel" or "venal" conduct.

Moreover, claims for intentional infliction of emotional distress are based upon separate

tortious conduct of the defendant which in no way involves a determination of the plaintiff's

---

scheme in a case of bad faith claim denial that did not meet this high threshold of offensive conduct.
These cases involved facts simply not alleged in the instant case, such as an employer's acute
awareness of a particular employee's precarious financial situation and termination of benefits
knowing and intending that cutting off or denying benefits would cause the employee severe
emotional distress.  The Sixth Circuit has twice affirmed this Court's holding that Plaintiffs' in
the instant case have not stated a claim for intentional infliction of emotional distress.  *See Brown II*,
492 F.3d at 647 and *Brown III*, 546 F.3d at 364.

underlying entitlement to benefits.  In *Broaddus,* where the court permitted plaintiffs' claim for intentional infliction of emotional distress to stand, the court recognized this "subtle yet crucial distinction:"

> While it is true that plaintiffs must prevail on a showing that the physical injuries were compensable prior to showing that defendants acted in collusion to deny those benefits, a subtle yet crucial distinction must be made clear. Plaintiffs are not seeking as damages in this lawsuit the compensation benefits they alleged were required to be paid from July 2, 1973, to December 17, 1973. They are seeking, in part, separate damages for emotional distress caused by the alleged intentional and wrongful denial of these compensation benefits. It is the emotional and mental injuries which are the subject of the lawsuit, and which are claimed by plaintiffs to be not compensable under the Act and thus actionable in a common-law tort suit.

84 Mich. App. at 599.  Plaintiff in *Broaddus* was already receiving workers' compensation benefits pursuant to a settlement, and was seeking damages for a separate and independent tort, intentional infliction of emotional distress, that did not in any way involve a determination of her entitlement to benefits.[12]

The court in *Gates* commented on this same "subtle" distinction.  Rejecting plaintiffs' argument that the exclusivity rationale inevitably would bar even the most egregious behaviors of an insurer or employer, the court distinguished scenarios which involved  separate tortious conduct (for example where an insurer gained illegal entry into a claimant's home in the course of an investigation), the proof of which was independent of the underlying claim for benefits:

> But the obvious difference between the examples posed by Atkinson and Larson (see note

---

[12]  It appears, based upon the allegations of Plaintiffs' Complaint, that Plaintiff Brown was awarded benefits through the appeal process but it is not clear (1) whether that claim has been finally determined or (2) if it has been finally determined, and Plaintiff is in fact receiving benefits, the nature of Plaintiffs' damages, which are stated in the Complaint to be the same as those of the other Plaintiffs who never appealed their denials and are not receiving benefits.  Regardless of the finality of Plaintiff Brown's claim for benefits, his claim fails, along with all other Plaintiffs, for the separate and independent reason that he failed to allege an injury to business or property as discussed in section IIIB, *infra.*

23

> 7, supra) in this connection, and the case of bad faith refusal to pay compensation benefits, is that in the former class of case plaintiff's entitlement to recover in the tort action is in no way dependent on his having been entitled to compensation benefits or to the defendant's having violated the compensation statute. By contrast, in order to recover for bad faith or malicious failure to pay compensation benefits there must have been an entitlement to such benefits or a violation of the compensation statute in the failure to pay them.

838 F.2d at 814-815.

At the hearing on this matter, in response to Defendants' argument regarding the underlying nature of the injury Plaintiffs are claiming in the instant case which is addressed more fully *infra* in section IIIB, Plaintiffs' counsel posed the following hypothetical to the Court: what if the RICO scheme involved the theft of Plaintiffs' benefit checks before Plaintiffs received them, would the injury still be derivative of Plaintiffs' personal injuries and thus not compensable under RICO? This hypothetical is inapt and crystallizes the fundamental flaw in Plaintiffs' claim - this scenario involves a separate and independent tort (theft or conversion or some similar claim) which is in no way dependent upon proof of Plaintiffs' underlying entitlement to their workers' compensation benefits. Plaintiffs in the instant case have made clear that they are not seeking damages for emotional distress (likely because such damages are clearly not recoverable under RICO), and that they are seeking to recover the workers' compensation benefits that they allege they were wrongly denied, along with medical expenses and attorneys fees which are wholly derivative of their claim that they are entitled to benefits.

Regardless of how they package their RICO claim, Plaintiffs are asking this Court to decide whether they were entitled to receive workers' compensation benefits and, secondarily, if they were so entitled, whether Defendants' initial denial of those benefits was fraudulent. They seek to impugn the character and credibility of Dr. Margules and to show that the injuries they sustained were in fact work related or sufficiently disabling to entitle them to workers' compensation benefits. The

24

gravamen of their claims is that the physician chosen by their employer was unfairly influenced by their employer's interests and conducted an unfair, even fraudulent, medical exam which they claim resulted in the denial of their benefits.  Plaintiffs' Complaint is replete with allegations of conflicting medical opinions as to each Plaintiff's injury, asserting that one doctor's pedigree and opinion trumps that of Dr. Margules or another doctor.  This is precisely the fact finding process that the Michigan legislature placed squarely and exclusively within the special competence of the WCDB and the WCAC, with the possibility of limited judicial review following an administrative determination.  As the court observed in *Feld v. Robert & Charles Beauty Salon*, 435 Mich. 352 (1990), the unfairness of which these Plaintiffs' complain is best addressed through the WDCA procedures:

> [T]he plaintiff argues that medical examinations conducted pursuant to § 385 are inherently unfair because "[t]he physicians selected by the carriers for the employers are often the same physicians time after time and are well versed with the Workers' Compensation laws and procedures." However, given the current scheme of the WDCA, we suggest that the appropriate remedy for this concern would be to impeach the credibility of the physician selected by the carrier through cross-examination. Additionally, an attorney would have "ample opportunity to challenge the use made of the information obtained by the examination when the findings are presented as evidence in court." Barbet, Compulsory medical examinations under the federal rules, 41 Valor 1059, 1074 (1955).

435 Mich. at 365-366.  This perceived unfairness is inherent the scheme and is part of the delicate balance struck by the legislature in deciding to impose what is in essence a no-fault system on employers for workplace injuries sustained by their employees.

As recognized by the courts in *Feld, Warner* and *Couture*, and by the courts in *Sample* and *Gates* interpreting the parallel provisions of the LHWCA, the procedures and remedies set forth in these workers' compensation schemes are Plaintiffs' exclusive avenue for redressing their claims of even allegedly bad faith denials of workers compensation benefits.  To allow actions for allegedly

bad faith claim denials to proceed in tandem, or in lieu of, this system would subvert the clear intent

of the legislature to vest these factual determinations in the workers compensation boards created

to decide them and would create an intolerable potential for inconsistent results. As the court noted

in *Gates,* discussing the provisions of the LHWCA:

> [W]here entitlement to the compensation benefits would be a necessary element of
> plaintiff's right to recover in a tort suit, to allow the separate tort action opens the
> possibility of inconsistent results between the resolution of the compensation claim
> itself and the resolution of the separate tort claim, as the two claims would be
> adjudicated by different bodies. This consideration is clearly applicable in the
> LHWCA context where the compensation rulings are made in a federal
> administrative framework, with provision for appeal to an administrative review
> board and then to a regional federal court of appeals, while the tort action would
> likely be determined by a jury in a state or federal trial court. In the second place, the
> LHWCA, in common with many other compensation statutes, expressly addresses
> the matter of when payments thereunder are to be made and provides penalties for
> failing to timely make the required payments. By contrast, neither the LHWCA nor
> the typical compensation statute addresses in any analogous manner the methods
> which the employer or insurance carrier may or may not utilize in investigating the
> claim.

*Gates,* 838 F.2d at 815.

Regardless of how Plaintiffs' characterize the alleged "fraud" in this case, they cannot

disentangle their RICO claim from their underlying claim for benefits, the resolution of which lies

within the exclusive jurisdiction of the WDCA. As noted by the courts in so many of the cases

discussed above, if Plaintiffs' feel that the penalty provisions of the statute fail their essential

purpose, this is an issue best addressed by the legislature.

### 2.   The existence of this exclusive, comprehensive administrative scheme forecloses Plaintiffs' RICO claims.

Plaintiffs' attempt to convert their dispute over entitlement to workers compensation benefits

into a RICO claim is foreclosed by the extensive administrative scheme which has been specifically

enacted as an exclusive remedy to address the wrongful denial of those benefits.  Several courts have addressed this issue in other contexts and have held that where there exists a comprehensive statutory scheme, that does not provide for a private right of action, a plaintiff cannot create a RICO claim out of a matter that would otherwise be exclusively addressed by that administrative scheme. In *Jackson,* Judge Edmunds conducted this inquiry specifically with respect to the WDCA, on facts materially indistinguishable from the present case, and concluded that Plaintiffs' sole remedies were those set forth under the WDCA and rejected Plaintiffs' attempt to avoid those procedures and exclusive remedies "simply by characterizing a denial of benefits as 'fraudulent.'" 2010 WL 931864 at * 18.

As noted by the court in *Jackson*, several cases compel this conclusion.  For example, in *Danielsen v. Burnside-Ott Aviation Training Center, Inc*., 941 F.2d 1220 (D.C. Cir. 1991), employees of various Navy aircraft maintenance contractors brought a RICO claim against their employers alleging that the employers had misclassified the workers as "technicians" when they should have been classified as "aircraft workers." Classifying the workers as "aircraft workers" would have entitled them to earn a higher wage. *Id*. at 1225-26.  The employees claimed that the predicate acts were mail and wire fraud which consisted of entering into the contracts and using the mails and wires in furtherance of the contracts. *Id.* at 1226.  The court found that the employee's claims were cognizable under the Service Contract Act, 41 U.S.C. § 351 (the "SCA") which specifically addressed wage and other issues under federal or federally assisted contracts. *Id*. at 1223.  The statutory scheme involved multiple levels of administrative review of claims and numerous regulations relating to the methodology by which wage classification determinations were to be made. *Id.*  The court concluded that the SCA did not give to a private right of action and went

27

on to hold that the exclusive remedy embodied in the SCA scheme also did not allow for a civil

action under RICO:

> [W]hat plaintiff will pursue his administrative remedies under the Act where more direct and expeditious relief is available in a private suit? How much more the case where plaintiffs couch their complaint in terms of RICO to give them, not a remedy equal to that provided under the SCA, but three times that remedy? How much more still where their attorneys would be extracting their fees not from their clients but from the other side? Thus, the ingenious pleading of the action in RICO terms rather than in straight SCA language cuts against the implication of the right of action rather than in its favor.

941 F.2d at 1228 (citing *Miscellaneous Service Workers, etc. v. Philco-Ford Corp.*, 661 F.2d 776

(9th Cir. 1981)).

In *McCulloch v. PNC Bank Inc*., 298 F.3d 1217 (11th Cir. 2002) the court came to the same

conclusion analyzing claims cognizable under the Higher Education Act ("HEA"). Parents of

college-bound students brought claims under HEA and RICO against lenders and marketers of

student loans who allegedly failed to disclose that there were alternative lending arrangements

available to students whose parents did not qualify for federal parent loans. The court held that there

was no private right of action under HEA and concluded that plaintiffs' RICO claims were similarly

foreclosed:

> Plaintiffs' mail and wire fraud claims are nothing more than purported HEA violations pled in RICO terms. Thus, since Congress did not intend for Plaintiffs to have a private right of action against lenders for the failure to disclose Stafford Loan information, and instead provided administrative remedies, it follows that Congress could not have intended for that same failure to disclose to constitute a violation of the mail and wire fraud statute.

298 F.3d at 1226-27. The court relied in part on the Eleventh Circuit opinion in *Ayres v. General*

*Motors Corp*., 234 F.3d 514 (11th Cir. 2000), where the court found that violations of the National

Traffic and Motor Vehicle Safety Act could not serve as the basis for the predicate acts for a RICO

claim.  Citing the court's decision in *Danielsen,* the *McCulloch* court held: "[I]n light of the HEA's enforcement scheme, granting the Secretary of Education exclusive authority to remedy violations of the HEA, and the fact that the HEA does not confer a private right of action, the Court finds that the failure to disclose Stafford Loan information, even if in violation of the HEA, cannot form the basis for a civil RICO claim seeking treble damages and injunctive relief."  298 F.3d at 1227.  *See also Bodimetrics Health Servs., Inc. v. Aetna Life &* Casualty, 903 F.2d 480, 486-487 (7th Cir. 1990) (holding that RICO claims were foreclosed by the exclusive benefits determination process of the Social Security Act); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637 (2d Cir. 1989) (relying on *Danielsen* to hold that the Energy Reorganization Act provides the exclusive remedy for violations of its proscriptions and dismissing plaintiffs' RICO claim, cautioning that "artful invocation of controversial civil RICO, particularly when inadequately pleaded, cannot conceal the reality that the gravamen of the complaint herein is section 210 harassment."); *Bridges v. Blue Cross and Blue Shield Assoc.*, 935 F. Supp 37, 41-43 (D.D.C. 1996) (holding that the comprehensive administrative remedy scheme embodied in the Federal Employee Health Benefits Act ("FEHBA") left no room for a remedy under RICO: "the broad enforcement and oversight powers of the OPM established in the statute indicate that the exclusive remedy for an action cognizable under the FEHBA lies under the FEHBA, not under another federal statute."); *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594, 600-601 (D.N.J. 2000) (relying on the reasoning of *Danielsen,* finding that the Davis-Bacon Act contained a detailed administrative scheme which was the exclusive remedy for alleged underpayment of wages claims for work performed on federal construction projects, and dismissing plaintiffs' RICO claims based on alleged violations of the statute).[13]

---

[13]In this Court's prior Opinion in *Gifford v. Meda*, No. 09-cv-13486, 2010 WL 1875096 (E.D. Mich. May 10, 2010), the Court discussed these same cases and this same theory of exclusive

Plaintiffs claim that they were injured by Defendants' alleged RICO violations in that they were deprived of workers' compensation benefits, and incurred attorneys' fees, medical care expenses and mileage to and from medical care.  (Compl. ¶¶ 17, 25, 38, 42, 61, 70.)  As to each Plaintiff's RICO claim, the *ad damnum* clauses is identical: "[P]laintiff demands judgment against defendants [or against Cassens and Crawford only in the case of Plaintiffs Thomas and Riggs, who were not examined by Margules] for damages measured by the amount of benefits improperly withheld from him, plus interest as provided by law, all tripled in accordance with RICO, together with attorney fees and costs as provided by law."  (Compl. pp. 8, 10-11, 16, 18-19, 22-23, 26.)  Plaintiffs' characterization of the denial of benefits as "fraudulent" does not change the essence of the claim, which is for deprivation of benefits to which Plaintiffs claim they are entitled under the WDCA.  *See, e.g. Butchers Union Local No. 498 v. SDC Inv., Inc.*, 631 F. Supp. 1001, 1011 (E.D. Cal. 1986) ("Bluntly put, no matter how you cut the complaint, the only conceivable 'fraud' is the deprivation of plaintiffs' rights under the labor law.  Since defendants' liability, under the mail and wire fraud statutes, if any, is wholly dependent on the labor laws, judgment of the defendants' conduct . . . lies exclusively with the [NLRB].").  *See also Danielsen,* 941 F.2d at 1229 ("To frame the action for [an award of statutory benefits] in terms of RICO fraud adds nothing.")[14]

This Court agrees with Judge Edmunds conclusion in *Jackson* that:

> RICO was never intended to create a path into courts for litigants who would otherwise be limited to exclusive administrative remedies and procedures, and subject to strict damages limitations.  The Court finds that Plaintiffs may not use their RICO claims to reform Michigan's workers' compensation law - allowing them

---

administrative regulatory jurisdiction in a different context and borrows here from its discussion in that Opinion.

[14]  As discussed extensively above, Plaintiffs' claims in the instant case are wholly dependent upon a determination of the WDCA that they are entitled to the benefits which their employer disputes.

> to do so would be an unwarranted intrusion into Michigan state law and procedure. Because Plaintiffs' sole remedies are those set forth under the WDCA, Plaintiffs' RICO claims are dismissed.

*Jackson,* 2010 WL 931864 at * 18.

Plaintiffs argue that this result is foreclosed by the Sixth Circuit's opinion in *Brown III*, where, in dicta in its analysis of the issue of preemption under *McCarran-Ferguson*, that court stated that "the WDCA provision regarding sanctions for failure to pay benefits does not appear to contemplate the *fraudulent* denial of worker's compensation benefits." 546 F.3d at 363 (emphasis in original). The Sixth Circuit stated that this Court's finding, again made in the context of analyzing reverse preemption under *McCarran-Ferguson*, that a RICO suit would impair the Michigan legislature's goal of limited liability for employers, "relie[d] on the faulty premise that the state has a policy of limited liability for employers even when they *fraudulently* deny worker's compensation benefits." *Id*. (emphasis in original). The Sixth Circuit stated that "no authority supports this proposition," but did not discuss the holdings of the Michigan Court of Appeals in *Couture, Warren* and *Lisceki* where such a policy is expressed. *See Jackson,* 2010 WL 931864 at * 17 (rejecting plaintiffs' argument that *Brown III* foreclosed this result, noting that "there is no indication that the Sixth Circuit considered [*Couture* and *Warner*] which held that the WDCA strictly limits an employer's liability for disputing a workers' compensation claim - even those made in bad faith.") Nor did the Sixth Circuit specifically address the host of cases holding that exclusive statutory administrative schemes cannot be avoided by pleading as RICO violations claims which fall expressly under those procedures.

This Court concludes that Plaintiffs' remedy for recovery of their workers compensation benefits lies exclusively within the administrative scheme contained in the WDCA which forecloses

any claim under RICO and for that reason their RICO claims are dismissed.

> **B.**      **Plaintiffs' Lack Standing to Sue Under RICO Because Their Claims For Medical Expenses and Related Pecuniary Loss Sustained as Result of Their Workplace Injuries Do Not Constitute Injury to Business or Property Under RICO and Are Too Speculative to Confer Standing Under RICO[15]**

> **1.**      **Plaintiffs' damages derive from their workplace injuries and do not constitute injury to business or property under RICO.**

The RICO statute does not permit recovery of damages for personal injuries. *See* 18 U.S.C. § 1964(c). By its express terms, RICO provides for recovery only for "any person injured in his business or property." 18 U.S.C. § 1964(c). *See Drake v. B.F. Goodrich* Co., 782 F.2d 638, 644 (6th Cir. 1986) (holding that the phrase "business or property" excludes personal injuries suffered, rejecting plaintiffs' RICO claims, based on personal injury and wrongful death, alleging pecuniary loss as a result of exposure to toxic chemicals) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)). *See also Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918-19 (3d Cir. 1991) ("RICO plaintiffs may recover damages for harm to business and property only, not physical and emotional injuries due to harmful exposure to toxic waste.").

Not only do personal injuries themselves not provide standing in civil RICO cases, "but also [] pecuniary losses flowing from those personal injures are insufficient to confer standing under § 1964(c)." *Evans v. City of Chicago*, 434 F.3d 916, 926 (7th Cir. 2006). Recognizing that most personal injuries produce some sort of financial loss, courts have rejected the notion that such injuries confer standing under civil RICO:

---

[15] The Court notes that Plaintiffs' only response to Defendants' legal argument regarding the requisite "injury to business or property" necessary for standing to assert a claim under RICO is the statement that the Sixth Circuit in *Brown III* "specifically held plaintiffs plead damages." (PLS.' Resp. to Cassens Mot. to Dismiss, Dkt. No. 92, p. 3.) The Court agrees with Defendants that the Sixth Circuit did not address Plaintiffs' standing to assert a RICO claim and did not analyze or decide whether Plaintiffs have alleged a cognizable RICO "injury to business or property."

> In our view, the ordinary meaning of the phrase "injured in his business or property" excludes personal injuries, including the pecuniary losses therefrom. . . . [T]he pecuniary and non-pecuniary aspects of personal injury claims are not so separated as the appellants would have us accept; rather, loss of earnings, loss of consortium, loss of guidance, mental anguish, and pain and suffering are to be found, intertwined, in the same claim for relief.  We agree that "[h]ad Congress intended to create a federal treble damages remedy for cases involving bodily injury, injury to reputation, mental or emotional anguish, or the like, *all of which will cause some financial loss*, it could have enacted a statute referring to injury generally, without any restrictive language."

*Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988) (quoting *Morrison v. Syntex Laboratories*, 101 F.R.D. 743, 744 (D.D.C. 1984) (emphasis in original).  *See also Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992) (holding that miscellaneous expenses, including attorneys' fees and loss of earnings, which were totally derivative of plaintiff's alleged personal injuries, were not recoverable under RICO).

A court reached a similar conclusion in *Fisher v. Haliburton*, No. 06-1168, 2009 WL 5170280 (S.D. Tex. Dec. 17, 2009) which involved an attack by Iraqi insurgents on a group of civilian contractors driving fuel convoys in Iraq.  *Id.* at * 1.  Plaintiff contractors, who suffered physical injuries in the attack, alleged that Haliburton fraudulently failed to disclose the true risks of working in Iraq and sought in part, under RICO, damages in the amount of continued compensation they allegedly lost due to the injuries they sustained in Iraq as well as the difference in pay they would have received had the true risks of the work been disclosed.  *Id*. at * 4.  Rejecting plaintiffs' argument that their loss of compensation was caused not by personal injuries but by Haliburton's alleged predicate acts of mail and wire fraud in failing to inform them of the danger of the job, the court found that plaintiffs' alleged pecuniary injuries were a direct result of their personal injuries suffered in Iraq.  *Id.* "The injuries that plaintiffs suffered in Iraq caused their alleged loss of compensation, and that loss is intimately related to plaintiffs' personal injuries.

Consequently, because personal injuries and their resulting pecuniary consequences are not an "injury to business or property" under section 1964(c), plaintiffs' "continued compensation" injury does not confer standing to bring a RICO claim." *Id*. at * 5. *See also Allman v. Philip Morris, Inc.*, 865 F. Supp. 665, 668-669 (S.D. Cal. 1994) (finding that "federal courts that have addressed [the] question have all held that Congress intended the 'business or property' language to exclude civil RICO actions seeking recovery of expenses resulting from personal injury," and holding that medical expenses incurred as a result of personal injury (the expense of medical treatment and nicotine patches incurred by smokers who had become addicted to tobacco, allegedly through defendant's fraudulent acts) were the economic consequence of the underlying personal injury and not compensable under RICO); *Morrison v. Syntex Laboratories, Inc*., 101 F.R.D. 743, 746 (D.C. 1984) ("Thus, injury in one's property under the RICO provision would not include damages for the money lost as a result of the costs of medical attention and treatment incurred from the injuries allegedly sustained . . . from consumption of the alleged chloride deficient.")

In *Vavro v. Albers*, No. 05-cv-321, 2006 WL 2547350 (W.D. Pa. Aug. 31, 2006), a case involving the alleged fraudulent deprivation of workers' compensation benefits, parallels to the instant case are apparent and the court's reasoning instructive. Plaintiff suffered a workplace injury and filed a claim for workers' compensation benefits. His claim for benefits was denied and plaintiff brought suit under RICO, along with several other claims, to recover damages for various "personal and financial injuries" seeking damages "treble the equivalent amount of [Workers Compensation Benefits] and disability benefits he was entitled to receive, plus the costs of continuing health care over his lifetime." *Id*. at * 3-4.  Plaintiff claimed that, in addition to wrongfully denying plaintiff workmens compensation and disability benefits, defendants conducted fraudulent defensive medical

34

exams ("DMEs") and used plaintiff's personal medical information ("PMI") derived from those

exams to justify similar claim denials.  The court noted at the outset: "It appears that the present

lawsuit is nothing more than an attempt by plaintiff to relitigate his failed claims for WCOD and

disability benefits, albeit under the guise of state common law tort and civil RICO claims."  *Id.* at

* 5.  Rejecting plaintiff's claims on numerous other grounds, the  court concluded that plaintiff's

claim was barred "for a more primal reason in that he lacks standing under Section 1962(c) to bring

a civil RICO claim."  Citing many of the cases discussed above, the court thoroughly summarized:

> [A]ll of the injuries Plaintiff claims to have suffered constitute either personal injuries (intentionally inflicted distress, physical pain and mental distress, a diminished capacity to enjoy life, intentional infliction of emotional distress, denial of medical treatment and care), or financial injuries that derive from the alleged personal injuries ( i.e., incurred medical bills for treatment and care, loss of income, diminished earning capacity, and other substantial economic losses), none of which are deemed compensable under RICO. As the Court of Appeals noted in *Genty v. Resolution Trust Corp.*, "[i]n ordinary usage, 'injury to business or property' does not denote physical or emotional harm to a person. Indeed, the Supreme Court has declared that Congress's limitation of recovery to business or property injury 'retains restrictive significance. It would for example exclude personal injuries suffered." 937 F.2d at 918 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)); see also *Zimmerman*, 834 F.2d at 1169 (alleged injury of mental distress did not constitute an injury in business or property for RICO standing); *Fried*, 900 F.Supp. at 762-63 (declining to find plaintiff's claim for hazard pay constituted an "injury" for RICO standing where hazard pay would have allegedly been paid to induce workers to work in an environment contaminated by dangerous asbestos fibers; in reality hazard pay constituted compensation for fear of catching a disease which is a type of emotional distress not covered by RICO). Moreover, to the extent a RICO plaintiff attempts to claim financial losses that derive from the personal injuries, the courts have refused to find a cognizable injury to property for RICO standing purposes. See *Thomas*, 2005 U.S.App. LEXIS 7888, at *7-8 (affirming district court's rejection of civil RICO claim where alleged injury from RICO violations consisted of lost earning capacity due to depression which was found to be a non-cognizable injury under RICO); *Fried*, 900 F.Supp. at 762 (*quoting Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir.1988) (recognizing that although " 'recovery for personal injury has pecuniary aspects' ... it is important to distinguish between the pecuniary harm that arises from personal injuries and the pecuniary harm that arises from injury to business or property.")

2006 WL 2547350 at *21.   The court held that plaintiffs' claims for "out-of-pocket medical expenses, lost income, diminished earning capacity, although capable of valuation, all derive from his [underlying medical condition] and the denial of his workers' compensation claim . . . Therefore, Plaintiff's alleged injuries are not the type of "injury" that creates RICO standing."

In the instant case, Plaintiffs claim that they were deprived of workers' compensation benefits, and incurred attorneys' fees, medical care expenses and mileage to and from medical care and claim damages "measured by the amount of benefits improperly withheld from [them], plus interest as provided by law, all tripled in accordance with RICO, together with attorney fees and costs as provided by law."   These damages unquestionably were incurred as a direct result of Plaintiffs' on-the-job injuries.   But for their workplace injuries, Plaintiffs would have no claim at all.   The fact that the WDCA allows these Plaintiffs to bypass the legal proofs of negligence and causation normally associated with a personal injury claim does not change the nature of their claims – they seek to recover for injuries they allege that they suffered while working for Cassens and they seek medical benefits and related expenses.   Regardless of how Plaintiffs characterize the wrong, their medical expenses, workers' compensation benefits, medical mileage and attorneys fees are damages which are indisputably wholly derivative of their personal injuries and as such are not injuries to "business or property" under RICO.   Plaintiffs' seek damages in the amount of benefits they were denied and related medical expenses, i.e. they seek reimbursement for the pecuniary loss they suffered as a result of their workplace injuries, damages not recoverable under RICO, and therefore lack standing to bring their RICO claims.

> **2.** **Plaintiffs' damages, which are based upon a presumption of a legal entitlement to workers' compensation benefits, are too speculative to confer standing to bring their RICO claims.**

36

Speculative damages are not recoverable under RICO. "The effective means of punishing a defendant in the civil RICO context is to apply the treble multiplier to damages established by competent proof, not based upon mere speculation and surmise." *Fleischauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989). "'Injury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing.'" *Haliburton,* 2009 WL 5170280 at * 5 (quoting *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998)). In *Haliburton,* the court discussed this requirement in analyzing plaintiffs' claims for damages measured by the amount they would have received in compensation had they been fully informed of the risks of working in Iraq (i.e. had defendants not committed the alleged predicate acts of failing to inform them of the risks of working in Iraq). The court concluded:

> Whether plaintiffs would have been able to secure additional payment for their service in Iraq if any alleged undisclosed risks had been fully disclosed is speculative and does not confer standing under section 1964(c). See *Price*, 138 F.3d at 607; *In re Taxable Mun. Bond Secs. Litig.*, 51 F.3d at 523; *Oscar*, 965 F.2d at 785. The alleged compensation loss claimed by the plaintiffs is not a "concrete financial loss," but rather is a theoretical claim that is more in line with an "injury to a[n] ... intangible property interest." *Oscar,* 965 F.2d at 783 ("[A] showing of 'injury' requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest."). Thus, according to controlling precedent, the theoretical compensation loss claimed by plaintiffs is too speculative to confer standing for a civil RICO cause of action under section 1964(c).

2009 WL 5170280 at * 5.

Thus, standing to bring a RICO claim must derive from something more than a speculative, intangible property interest. "While federal law governs most issues under RICO, whether a particular interest amounts to property is quintessentially a question of state law. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982) ("The hallmark of property ... is an individual entitlement grounded in state law...."); *Board of Regents v.*

37

*Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (property interests "are created and their dimensions are defined by" sources "such as state law.")." *Doe,* 958 F.2d at 768.  As discussed at length above, "plaintiffs must prevail on a showing that their physical injuries were compensable prior to showing that defendants acted in collusion to deny those benefits . . . ." *Broaddus*, 84 Mich. App. at 599.   Until Plaintiffs can establish a legal entitlement to the benefits they claim to have been wrongfully denied, they cannot demonstrate a present property interest that would support of their claimed RICO injury.[16]

At the hearing on this matter, Plaintiffs' counsel argued to the Court that Plaintiffs are not seeking damages for their physical injuries but rather seek damages flowing from Defendants' "thwarting" the system, which is the conduct Plaintiffs claim caused their injuries.  In other words, they argue, they are not seeking to recover the expenses incurred as a result of their physical injuries (although admittedly their damages are measured by those expenses) but rather for their employer's wrongful failure to pay those expenses. This  "spin" on Plaintiffs' claim, which appears to be a semantic distinction without a difference, presumes that Plaintiffs' have an entitlement, a protected property interest, in the claimed benefits.  Plaintiffs' claim to reimbursement for medical payments and other expenses incurred as a result of their denial of workers' compensation benefits is based on pure speculation as to their entitlement to those benefits. They have not established a present property right in those benefits and cannot establish such a right, as discussed above, other than by a final determination of entitlement to benefits through the exclusive administrative procedures set

---

[16] In *Jackson*, Judge Edmunds came to a similar conclusion based on the legal principle of ripeness: "[T]he injury Plaintiffs may suffer in the denial of workers' compensation benefits - that have not been established - cannot yet be determined.  Only when Plaintiffs are able to establish an injury (i.e., after their eligibility for benefits has been determined) will their claims be ripe for suit.  Thus, Plaintiffs' RICO claims are dismissed."  2010 WL 931864 at * 21-22.

38

forth in the WDCA.  Accordingly, Plaintiffs' speculative alleged injuries, based upon the expectancy of a legal entitlement, do not confer standing to bring a claim under RICO and Plaintiffs claims are dismissed for this separate and independent reason.

To establish standing to sue under 18 U.S.C. § 1964(c), Plaintiffs must establish "injury to their business or property."  *Drake,* 782 F.2d at 644.  The phrase "business or property" excludes damages for personal injuries and the pecuniary losses flowing therefrom and excludes damages which are speculative and based upon mere expectancy interests.  The damages which Plaintiffs claim to have suffered are both too intimately tied to their personal injury claims and too speculative to constitute "injury to business or property" under RICO.  As a result, Plaintiffs lack standing to bring those claims and their RICO claims are dismissed.[17]

### C.    Plaintiffs' Motion for Leave to Amend

On September 9, 2010, one week before the hearing on this matter and more than two months after the last responsive pleading was filed on the instant motions, Plaintiffs filed a motion for leave to amend their Complaint, adding three new plaintiffs, a new defendant and additional factual allegations as to existing claims.  This is Plaintiffs' third proposed amended complaint.  Plaintiffs previously filed a motion to amend to their Complaint, on January 14, 2005.  (Dkt. No. 32).  Similar to the timing of the filing of the present third proposed amended Complaint, this first proposed amendment was filed shortly after the Defendants filed their original motions to dismiss.  Without

---

[17] As this Court discussed at length in *Brown I*, even if Plaintiffs' claims survived the instant motions, the Court would stay Plaintiffs' RICO claims, which allege entitlement to workers' compensation benefits, based upon the *Burford* abstention doctrine.  *Brown I*, 409 F. Supp. 2d at 801-803.  *In accord Jackson,* 2010 WL 931864 at * 14 (finding this Court's reasoning and analysis persuasive and holding that if plaintiffs' claims survived the pending motions to dismiss, the court would stay the RICO claims pending final determinations of eligibility for workers compensation benefits under the WDCA).  This Court agrees with Judge Edmunds that the Sixth Circuit did not address the *Burford* abstention issue in *Brown III*.

explanation, Plaintiffs' withdrew their first motion to amend on February 7, 2005. (Dkt. No. 36.) On July 15, 2005, after the Court held a hearing on the Defendants' original motions to dismiss, and just days before the Court issued its Opinion and Order dismissing Plaintiffs' Complaint, Plaintiffs filed their second motion for leave to amend their Complaint. (Dkt. No. 41.) The Court denied Plaintiffs' second motion for leave to amend in its Opinion and Order dated entered July 22, 2005. (Dkt. No. 42.) The Court notes that this "practice of 'testing' the strength of their claims in the face of Defendants' motions to dismiss" appears to be a technique which Plaintiffs' counsel also employed in the *Jackson* case. *Jackson*, 2010 WL 931864 at * 6, 9 n. 17 ("The Court does recognize, however, the merit in Defendants' argument that Plaintiffs appear to be using Defendants' motions to dismiss as an opportunity to test the strength of their claims at Defendants' expense - suggesting that the motions to amend are made in bad faith.")

The Court has reviewed the instant proposed amended complaint and rejects Plaintiffs' third attempt to hone their claims in response to the flaws in their pleadings made manifest by Defendants' motions to dismiss. This third proposed amended complaint purports to add three new plaintiffs whose claims, like those of the Plaintiffs presently before the Court, seek damages measured by the amount of workmens compensation benefits they claim to have been wrongly denied. There is nothing new or different in the claims of the proposed new plaintiffs, or in the added factual content with regard to Dr. Margules, which changes the nature of the claims or the damages sought. A review of the proposed amendments, which are replete with detailed allegations regarding the employees' injuries and the conflicting medical opinions assessing those injuries, strengthens this Court's resolve in concluding that Plaintiffs' claims must be determined in the first instance by the administrative scheme embodied in the WDCA.

40

The third proposed amended complaint purports to add a damage component, in addition to "the amount of benefits improperly withheld," measured by "the time delay in receipt of hose benefits." (*See e.g.* Proposed Amended Complaint, Dkt. No. 117, 33.) It is not clear whether this proposed amendment to the *ad damnum* clause is a claim for monetary or emotional damages but in either case, as discussed above, such damages flow directly from the injuries suffered by these workers and are of a type not compensable under RICO's requirement that a plaintiff plead injury to business or property. Additionally, such damages are based upon a presumption of a legal entitlement and are therefore too speculative to confer standing under RICO.

The Court concludes that resolution of the claims set forth in the third proposed amended complaint, which ask this Court to decide whether these workers were entitled to the workers compensation benefits that they claim they were fraudulently denied, has been committed by statute to a determination by the WCDB and the WCAC under the exclusive administrative scheme embodied in the WDCA. Additionally, the damages sought in the proposed amended complaint, which seek recovery of benefits for workplace injuries, do not constitute injury to business or property under RICO and are based upon a presumption of a legal entitlement and are therefore too speculative to confer standing under RICO. The Court concludes upon careful review that Plaintiffs' proposed amendments would not defeat the instant motions to dismiss. Therefore, Plaintiffs' motion for leave to file the proposed amended complaint is denied on the grounds of futility. *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) ("A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss.").

## IV.    CONCLUSION[18]

---

[18] Because the Court is dismissing Plaintiffs' RICO claims on the grounds addressed in this Opinion and Order, it need not reach the merits of Defendants' arguments that (1) that Plaintiffs' claims are

For the foregoing reasons, the Court:

(1)     **GRANTS** Defendant Cassens' motion to dismiss and for partial summary judgment and supplemental motion to dismiss, in which Defendant Crawford joins (Dkt. Nos. 83 and 95);

(2)     **GRANTS** Defendant Marugles' motion to dismiss (Dkt. No. 106);

(3)     **DENIES** as moot Defendant Cassens' renewed motion for summary judgment (Dkt. No. 82); and

(4)     **DENIES** Plaintiffs' motion for leave to amend (Dkt. No. 117).

IT IS SO ORDERED.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 27, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on September 27, 2010.

S/Denise Goodine
Case Manager

---

preempted by the LMRA; (2) that Plaintiffs have failed to plead and prove the existence of a RICO enterprise; and (3) that Plaintiffs have failed to adequately plead Dr. Margules' participation in the conduct of the affairs of the enterprise.